NORTHERN PAC. RY. CO. v. DULUTH S. S. CO.

(Circuit Court of Appeals, Eighth Circuit.    August 12, 1918.)

No. 5055.

1. NAVIGABLE WATERS ☞20(5)—COLLISION WITH BRIDGE—DAMAGES.
    Where a steamer collided with the draw of a railroad bridge over a navigable river, and both the steamer and bridge were injured, the railroad company, in event that the steamer was at fault, as well as its bridge tender, may recoup against the damages to the steamer the damages to its bridge.

2. SHIPPING ☞15—HARBOR RULES—CONSTRUCTION.
    The regulations for the operation of steamships and bridges in Duluth harbor, established by the Secretary of War by authority of acts of Congress, have the legal effect of statutes upon the subjects of which they treat, and like statutes should be interpreted so as to give effect to the intention, unless that effect is contrary to any permissible construction.

3. NAVIGABLE WATERS ☞20(5)—COLLISION WITH BRIDGE—REGULATIONS.
    Regulation 10 for operation of steamships and bridges in Duluth harbor, which provides that after giving the signal for opening the bridge the pilot should watch for return signals, and that if a return signal be not received the vessel shall be checked, *held* applicable, where the draw of a bridge was already open and the bridge tender made no reply to the signal; hence a vessel which was not checked down, so as to stop before reaching the bridge, must be deemed at fault for a collision which resulted when the tender closed the draw.

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Libel by the Duluth Steamship Company against the Northern Pacific Railway Company. From a decree for libelant, respondent appeals. Reversed and remanded, with directions to render decree for respondent.

A. C. Gillette, of Duluth, Minn. (C. W. Bunn, of St. Paul, Minn., and Oscar Mitchell, of Duluth, Minn., on the brief), for appellant.

Thomas H. Garry, of Cleveland, Ohio (Cotton, Neukom & Colton, of Duluth, Minn., and Goulder, White & Garry, of Cleveland, Ohio, on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges.

SANBORN, Circuit Judge.    About 1:30 in the morning on July 23, 1913, the steamer Sonoma, which was owned by the Duluth Steamship Company, a corporation, was proceeding easterly along the St. Louis river in Duluth harbor when it collided with the drawbridge of the Northern Pacific Railway Company across that river, and the steamer suffered damages in the sum of $1,810.61 and the draw in the sum of $2,282.39.    The Steamship Company filed a libel in admiralty against the Railway Company, and alleged therein that the collision was caused by the negligence of the bridge tender of the Railway Company, and it prayed for a decree for the recovery of the amount of the damages to the steamship from the Railway Company.    The latter company answered that the collision was not caused

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

by the fault of its bridge tender, or of itself, but by the negligence of the captain of the Sonoma, and prayed to be dismissed. The parties stipulated that their respective damages were as above stated, the suit was tried in due course, the court found the bridge tender was guilty of causal negligence, and that the captain of the steamer was not. In this court the finding of the negligence of the bridge tender is not seriously challenged, but it is strenuously asserted that the court erred in its finding that the captain of the steamer was not also guilty of substantial causal negligence.

[1] If the captain of the steamer was guilty of substantial negligence which directly contributed to cause the collision, the Railway Company is entitled to recoup its damages against this Steamship Company up to the amount of the latter, and, as its damages are greater than those of the Steamship Company, to a decree of dismissal of the suit on its merits. Ebert v. The Reuben Doud (D. C.) 3 Fed. 520, 530, 531; The North Star, 106 U. S. 17, 27, 1 Sup. Ct. 41, 27 L. Ed. 91; Bowker v. United States, 186 U. S. 135, 140, 22 Sup. Ct. 802, 46 L. Ed. 1090; 1 Corpus Juris, 1321.

[2, 3] The question in this case therefore is: Does the evidence clearly prove the negligence of the captain of the steamship? for the legal presumption is that the finding of the court below was correct, and it may not be disturbed, unless the record presents a substantial preponderance of the evidence to the contrary. The answer to this question is conditioned by the true answer to the question: Did the captain comply with the regulations for the operation of steamships and bridges in Duluth harbor established by the Secretary of War by authority of the acts of Congress? Those regulations are printed under several headings, such as "Speed of Vessels," "Signals for Opening Bridges," "Signals by Bridge Tenders," "Equipment," "Aerial Bridge," "Rafts," "Towing Through Bridges." Under the heading "Signals for Opening Bridges," regulations 7, 8, 9, and 10 are found. Regulation 7 prescribes the kind of blasts of the steam whistle of a steamship to be used as the signal for the opening of the respective bridges, as for the "Wisconsin draw, N. P. bridge, 2 long, 2 short." Regulations 8 and 9 prescribe the distances from the respective bridges at which the signals should be given. This is regulation 10:

"After giving the signal for opening the bridge the pilot should watch for the return signals from the bridge tender described in paragraphs 11, 12, and 13, and be governed accordingly. If a return signal should not be received at once the vessel shall be checked down prepared to stop before reaching the bridge, and the opening signal shall be repeated."

Under "Signals by Bridge Tenders" regulations 11, 12, 13, and 14 are grouped. The first paragraph of section 12 is the only one relative to the controversy in this case. It reads in this way:

"12. Upon receiving a signal for opening the draw the tender shall at once answer with a return signal, which shall be the same as the signal for opening, to indicate that the vessel signal has been heard."

This is what happened at the time of the collision in this case. When the Sonoma was approaching the Wisconsin draw of the

Northern Pacific bridge at a speed of two or three miles an hour, at a distance of about 2,000' feet therefrom, the captain clearly saw that the draw was open and gave the prescribed signal for opening; but he failed to "watch for the return signals from the bridge tender described in paragraphs 11, 12, and 13, and be governed accordingly," as directed by rule 10. The bridge tender failed to hear his signal, and therefore did not return it. But the captain did not comply with the direction of rule 10 that:

"If a return signal should not be received at once the vessel shall be checked down prepared to stop before reaching the bridge, and the opening signal shall be repeated."

He did not check down his vessel, so that he could stop it before reaching the bridge; neither did he repeat the opening signal. He took his vessel on toward the bridge at the same speed, until he came so near to it that he could not stop his vessel before reaching the bridge. Meanwhile the bridge tender had received notice by electric bell from the tender of another bridge that a train was approaching on the railroad to cross his bridge, and as he had not heard any signal from the Sonoma, and did not know that it was approaching, he proceeded to close his draw, and the collision occurred.

Counsel for the Steamship Company forcibly argue that the regulations which have been quoted are limited in their application to cases in which the bridges are closed and signals are required to cause them to be opened, and that they are inapplicable to cases where the bridges are open and the desire and intent of the masters of the ships is that they shall be kept open until the approaching ships can pass through them, and this was the view which the court below adopted. The argument is that the heading over rules 7, 8, 9, and 10 is "Signals for Opening Bridges"; that regulation 7 prescribes for the Wisconsin draw of the Northern Pacific bridge the signal "which shall be given as a signal for opening"; that regulation 2 prescribes that speed is to be reduced so as to enable an approaching vessel to stop before striking the bridge "in case the draw fails to open"; that regulation 10 states that "after giving the signal for opening the bridge the pilot should watch for the return signals"; that regulation 12 declares that upon receiving "a signal for 'opening' the draw" the tender shall answer; and regulation 15 provides that the bridge shall be equipped so that the draw "can be opened promptly."

This argument may at first blush seem quite persuasive, but a careful study of the regulations and deliberate reflection have convinced that the construction this argument is presented to sustain is too narrow and literal. These regulations have the legal effect of statutes upon the subjects of which they treat, and they should be interpreted by like rules. In their construction the cardinal rules that the intention of the Secretary who made them should be ascertained therefrom and given effect, if possible, that the mischief he was seeking to remedy, the purpose he was endeavoring to accomplish, the consequences of differing permissible interpretations may be considered to ascertain his intention, and that when it is ascertained it should

be given effect, notwithstanding the dry words and literal terms of the regulations, unless that effect is clearly contrary to any permissible construction of them; that a reasonable, sensible interpretation of them should be given, and if consonant with their terms they should have an interpretation which will advance the remedy and repress the wrong. Stevens v. Nave-McCord Mercantile Co., 150 Fed. 71, 75, 80 C. C. A. 25, 29; United States v. Ninety-Nine Diamonds, 139 Fed. 961, 964, 72 C. C. A. 9, 12, 2 L. R. A. (N. S.) 185.

The harbor of Duluth in July is a busy place. Engines and cars are frequently, it may almost be said constantly, passing over the bridges therein across the St. Louis river, and vessels are frequently, it may almost be said constantly, passing through the draws of these bridges in the night as well as in the day. The Secretary and all the parties to this suit, and their employés and agents who had to do with the operation of the steamship and the bridge, knew these facts well, and that, however keen the lookout of the captain, the pilot, and the bridge tender, this lookout was not sufficient to protect vessels, bridges, and railroad trains from the dangers of a lack of coordination and coaction between them. It was accordingly undoubtedly the intention and purpose of the Secretary, by these regulations, to require such communications by means of the signals he prescribed between the masters or pilots of vessels and the bridge tenders that no vessel would undertake to pass through any bridge in this harbor referred to in these regulations until the master of it had given notice of his intention to pass and had received a signal from the bridge tender that it was safe for him to do so.

The mischief the Secretary was seeking to remedy was the attempt of masters of vessels to pass through these bridges before they had given notice of their intention to pass by the signals he prescribed, and had received the answering signals he fixed from the bridge tenders to the effect that it was safe for them to do so. The Secretary, the parties to this suit, and their responsible employés in this case, knew that the mischief and danger of an attempt of the captain, pilot, or master of a vessel to pass through an open draw in one of these bridges, without the notice signal and the answering safety signal from the bridge tender, were as great as an attempt to pass through a closed bridge without such danger signals. Indeed, the truth is that the mischief and danger were greater in the former case because the masters of vessels can see a closed bridge and can know that the obstruction is there, and then can and naturally will stop before they reach it. But where the draw is open it is liable to be closed at any moment on a signal from the approaching engine or train seeking to cross it, without any notice or knowledge that it is to be closed by the master of the vessel, and unless the masters of vessels give signals, and get safety signals from bridge tenders in return, where the draws are open, they are liable to suffer at any moment from the mischief and danger that it was the object of the regulations of the Secretary to avoid.

A construction of these rules that they are inapplicable to cases in which masters of vessels are approaching open draws in this har-

bor leaves the mischief and danger in such cases without the preventive safeguards the Secretary sought to provide, while an interpretation that they include and are applicable to such cases effects his intention, accomplishes his purpose, represses the mischief he sought to avoid, and advances the remedy he provided. A careful perusal of all these regulations and a thoughtful consideration of their purpose and effect satisfies that they are not so inconsistent with a construction which shall accomplish this end that it ought not to be given them. And our conclusion is that the true interpretation of regulations 10 and 12 is that they require the masters of vessels approaching open draws in the bridges in Duluth harbor specified in those regulations, for the purpose of passing through those bridges, to give the opening signals prescribed therein for the purpose of keeping those draws open until their vessels can pass through, and to secure the return safety signals there prescribed from the bridge tenders before attempting to pass.

The act of the captain of the Sonoma in giving the opening signal as he approached the bridge which he knew was open indicates that he was not oblivious of the danger of attempting to pass without giving that signal, and having given it he fell directly under the provision of rule 10 that he should watch for the return signal from the bridge tender, and that if the return signal was not received at once he should repeat the opening signal and check down his vessel, so that he could stop before he reached the bridge. These things it was his plain duty to do. If he had done them, the collision in all probability would not have resulted. His failure to do them directly contributed to cause the collision, and it was error to render a decree in favor of his employer, the Steamship Company.

The decree below must therefore be reversed, with costs, and the case must be remanded to the District Court, with directions to render a decree in favor of the defendant; and it is so ordered.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes