## UNITED STATES v. NORFOLK–BERKLEY BRIDGE CORPORATION et al.

### Petition of WOOD TOWING CORPORATION.

District Court, E. D. Virginia. October 9, 1928.

H. H. Rumble, Sp. Asst. Atty. Gen., and M. H. Avery, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., for the United States.

Williams, Loyall & Taylor, W. H. T. Loyall, Leigh D. Williams, and J. Westmore Willcox, all of Norfolk, Va., for Norfolk-Berkley Bridge Corporation.

John W. Oast, Jr., of Norfolk, Va., for Wood Towing Corporation.

SOPER, District Judge. Two collisions between ships under tow by tugs of the Wood Towing Corporation with the toll bridge of the Norfolk-Berkley Bridge Corporation at Norfolk, Va., are the basis of the proceedings in these cases. The first collision took place on December 28, 1926, at about 7:30 a. m., when the steamship Poljana, under the tow of the tug C. H. Hix, was proceeding west-

wardly through the draw. The tug was on the port bow of the steamship. A small iron house on the deck at the starboard quarter of the ship came in contact with the operating gears of the north leaf or span of the bridge. Little or no damage was done to the steamship, and none to the tug, but there was substantial damage to the bridge. It is alleged that the cost of replacement and repairs of the bridge was $44,795.46, and that a loss of tolls in the additional sum of $15,000 was sustained in the interval between the day of the accident and February 28, 1927, while the work of restoration was in progress.

The second accident happened at 4:04 p. m. on October 10, 1927, while the steamship West Alsek, belonging to the United States, was being taken through the draw in an easterly direction in tow of the tug Peerless, of the Wood Towing Corporation, assisted by the tug Stallion, belonging to the United States. Both tugs were on the port side of the ship as the flotilla passed through the draw. The ship safely passed the western entrance of the draw, but her flying bridge on the starboard side collided with the eastern operating gears of the southern leaf of the bridge. There was no injury to the tugs. It is alleged that the damages to the ship amounted in the aggregate to approximately $10,000. The damages to the bridge were also substantial. It is said that the replacement and repairs cost the sum of $46,990.05, and that the bridge corporation sustained a loss of $10,000 in tolls during the period of two months after the accident, when the bridge was necessarily closed.

Legal proceedings were commenced by the Wood Towing Corporation on January 15, 1927, when it filed a petition in this court, as owner of the tug C. H. Hix, under R. S. §§ 4282 to 4287 (46 USCA §§ 182–187), to limit its liability with reference to the first accident. The tug was surrendered, and subsequently sold for the sum of $23,100, which, together with towage in the sum of $58.38, or a total of $23,158.38, constitutes the fund in this proceeding. On March 23, 1927, the Norfolk-Berkley Bridge Corporation filed its answer and complaint to subject the fund to the payment of its losses. The bridge corporation had theretofore not filed a suit at law for damages, because the extent thereof had not been definitely ascertained.

On January 12, 1928, the United States, as owner of the West Alsek, filed a libel against the bridge corporation and the towing corporation to recover for the damages to the ship, claiming that the tug Peerless was neg-

ligent by reason of bad seamanship, and that the bridge was also negligent, in that it had not been constructed in accordance with law. Answers were filed by the two respondents, each of which denied liability, and attributed the accident to the negligence of the other.

On March 29, 1928, the Wood Towing Corporation filed a petition, as owner of the tug Peerless, to limit its liability with reference to the second collision. The United States and the bridge corporation have each filed answers and claims in this proceeding, asking that their damages be paid out of the funds to be created by the transfer or sale of the boat. An ad interim stipulation, in the sum of $30,000, was filed by the tug, and she was released to her owner. The precise value of the vessel has not yet been determined.

The right of the towing corporation to limit its liability in the two cases is denied in the pleadings, but it was not questioned at the hearing, and it is clear from the testimony, that the right to limit was made out in each case.

So far as the right of the United States to recover the damages to the West Alsek is concerned, one point only need be discussed. There was no steam in her boilers at the time of the accident, and although the tug Stallion, belonging to her owner, assisted in the operation, the whole flotilla was under the absolute control of the master of the Peerless, so that the ship was in no way responsible for her navigation. Therefore, since there is no contention that the accident was unavoidable, the United States in ordinary course would be entitled to recover against the party or parties to whose negligence the accident should be attributed. The Cromwell (C. C. A.) 259 F. 166.

But the towing corporation contends that, even if negligence on its part contributed to the collision, it is exempt from liability by reason of certain letters which passed between it and the United States Shipping Board shortly after the collision of the steamship Poljana with the bridge. On December 30, 1926, the towing corporation addressed a letter to the Shipping Board and certain shipyards in Norfolk, and gave notice that thereafter it would take ships through the bridge only at their own risk. Reference was made to the extension of the superstructure of the bridge over the fender piling and the insufficient and dilapidated condition of the latter. The district director of the Merchant Fleet Corporation acknowledged receipt of the notice by letter of December 31, 1926.

Some difference of opinion has devel-

oped in the decisions of the courts as to whether a tug, not being a common carrier, may lawfully exempt itself from liability for its own negligence. The Second Circuit, in The Oceanica (C. C. A.) 170 F. 893, and Ten Eyck v. Director General of Railroads (C. C. A.) 267 F. 974, has held that such contract is valid, whereas the Ninth Circuit, in Mylroie v. British Columbia Mills Tug & Barge Co. (C. C. A.) 268 F. 449, has indicated a contrary opinion. See the discussion in The Pacific Maru (D. C.) 8 F.(2d) 166. It is not necessary in this case to decide which rule should prevail, for it has recently been decided by the Supreme Court in Compania de Navegacion v. Firemen's Fund Ins. Co. (The Wash Gray) 277 U. S. 66, 48 S. Ct. 459, 72 L. Ed. 787, that a towing contract, in all substantial respects similar to that between the parties in this case, did not have the effect of releasing the tug from loss or damage to the tow, due to the negligence of the master or crew of the towing vessel. The correspondence in the case at bar indicates that the towing corporation was seeking to give notice of the dangerous condition of the bridge, so as to free itself from liability for any accident arising therefrom, rather than from the negligent operation of its own vessels. The United States is entitled to recover in this action.

As already pointed out, the towing corporation suffered no damages. The main contested question, therefore, in each case, is whether the injury to the bridge resulted from negligent navigation of the tug, or from the unlawful character of the bridge, or from both of said causes. The bridge spans the eastern branch of the Elizabeth river, and connects two sections of the city of Norfolk. It runs nearly north and south, connecting Norfolk on the north side of the river with Berkley, on the south. The course of the stream is westerly through the draw. The bridge is constructed of steel and iron and rests upon concrete piers. To admit the passage of vessels, there is a bascule or counterpoised draw 140 feet in length, consisting of two pivot leaves or spans which are raised and lowered by machinery electrically operated. The maximum clearance when closed is 35.5 feet above mean high water. The lifting apparatus consists in part of two quadrant gear racks for each leaf of the bridge. These are situated at each side of the leaf, and are equipped with gear teeth which are presented channelward when the leaf is lifted. When the leaf is in such a position, the quadrant racks are at its base, and are about 30 feet above the surface of the water. The iron house on the Poljana came in contact with the gear teeth of both quadrant racks on the north or Norfolk side of the bridge in the first accident, and the flying bridge of the West Alsek came in contact with the easterly quadrant rack on the Berkley side in the second accident.

The claim is made, both by the United States and by the towing corporation that the bridge was dangerous and unauthorized in its construction, because at the time of each accident the gear racks, which came in contact with the moving ship, extended channelward over the fender piling placed beneath them to mark the channel through the draw and to protect the bridge. This contention forms an important part in this case, particularly as there was nothing unusual or difficult about the condition of wind or tide at the time of either accident. It may be said, in short (notwithstanding certain claims put forth by the navigators of the tug in each instance), that, unless the bridge was negligently constructed or maintained, there is no escape from the presumption of negligence which arises when a stationary object is struck by a vessel in motion. The Cromwell (C. C. A.) 259 F. 166.

It is important, therefore, to determine first of all whether there is ground for the contention that the bridge was illegally built, and, if so, whether the particulars in which it failed to conform with the legal requirements brought about the accidents under consideration. The bridge was constructed in 1916–1918, pursuant to the authority contained in the General Bridge Law of March 1906, 34 Stat. 84, 33 USCA §§ 491–498, the relevant provisions of which are as follows:

"1. When, hereafter, authority is granted by Congress to any persons to construct and maintain a bridge across or over any of the navigable waters of the United States, such bridge shall not be built or commenced until the plans and specifications for its construction, together with such drawings of the proposed construction and such map of the proposed location as may be required for a full understanding of the subject, have been submitted to the Secretary of War and Chief of Engineers for their approval, nor until they shall have approved such plans and specifications and the location of such bridge and accessory works; and when the plans for any bridge to be constructed under the provisions of this act have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans, either before or after completion of the structure, unless the modification

of such plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War.

"2. That any bridge built in accordance with the provisions of this act shall be a lawful structure. * * *

"4. That no bridge erected or maintained under the provisions of this act shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed, and if any bridge erected in accordance with the provisions of this act shall, in the opinion of the Secretary of War, at any time unreasonably obstruct such navigation, either on account of insufficient height, width of span, or otherwise, or if there be difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water craft, it shall be the duty of the Secretary of War, after giving the parties interested reasonable opportunity to be heard, to notify the persons owning or controlling such bridge to so alter the same as to render navigation through or under it reasonably free, easy, and unobstructed, stating in such notice the changes required to be made, and prescribing in each case a reasonable time in which to make such changes, and if at the end of the time so specified the changes so required have not been made, the persons owning or controlling such bridge shall be deemed guilty of a violation of this act; and all such alterations shall be made and all such obstructions shall be removed at the expense of the persons owing or operating said bridge. * * *

"6. That whenever Congress shall hereafter by law authorize the construction of any bridge over or across any of the navigable waters of the United States, and no time for the commencement and completion of such bridge is named in said act, the authority thereby granted shall cease and be null and void unless the actual construction of the bridge authorized in such act be commenced within one year and completed within three years from the date of the passage of such act."

A special act of Congress was passed on January 2, 1915 (38 Stat. 790), giving the consent of Congress to the bridge corporation to construct, maintain, and operate a bridge across the Eastern branch of the Elizabeth river, at or near the east end of Main street in the city of Norfolk, Va., in accordance with the provisions of the General Bridge Act. The corporation, however, failed to commence the bridge within one year after the passage of the act, and consequently a second special act of Congress was passed June 22, 1916 (39 Stat. 236), whereby the time for commencing and completing the bridge authorized by the prior act was extended one year and three years, respectively, from June 22, 1916. An application, together with plans, specifications, and drawings for the construction of the bridge, and a map of the proposed location, were submitted to the Secretary of War and Chief of Engineers after the passage of the Act of January 2, 1915, and a second application of similar character was filed under the act of 1916. The only relevance of the 1915 drawings to this case is that they show the precise location, courses, and distances of certain port warden's lines, also depicted, but with less particularity, in the drawings filed in 1916.

The contention is that the bridge as constructed in 1916 was illegal, in certain parts in which it departed from the general plans thus filed with the Secretary of War and approved by him, subject to the following conditions set out in the permit:

(1) That the engineer officer of the United States Army in charge of the district within which the bridge is to be built, may supervise its construction in order that said plans shall be complied with.

(2) That all work shall be conducted in such manner as not to interfere with the free navigation of the waterway or impair the present navigable depths.

(3) That the clear width of opening between fenders shall be not less than 140 feet measured at right angles to the port warden's lines, and all the piers of the bridge shall be parallel to the said port warden's lines.

Condition 3 is particularly important in this case, because it involves the particulars in which it is claimed that the bridge corporation failed to comply with the terms upon which the approval of the Secretary of War was granted. The condition refers to the port warden's lines. Two of such lines, parallel to each other, one on the Norfolk and one on the Berkley side of the opening, were shown on the drawings, forming an angle approximately 10 degrees with the line of the piers of the bridge. As a matter of fact, the drawings submitted by the bridge corporation were incorrect in this respect because the port warden's lines were not so located. There were three port warden's lines, no two of which were parallel. One of them was located on the Norfolk side of the river, and the other two on the Berkley side of the river, crossing each other approximately at the center line of the proposed bridge. Under these circumstances, it was manifestly impossible to comply literally with the provi-

sions of the third condition of the Secretary's permit that all the piers of the bridge shall be parallel to the port warden's lines.

No attempt was made to submit new plans, or to secure from the Secretary a modification of the plans which had been approved. The engineers of the bridge corporation, with the approval of the district engineer, whose duty under the permit was to supervise the construction of the bridge in order that the plans should be complied with, determined not to make the piers of the bridge parallel with the port warden's lines incorrectly drawn upon the map, but selected the westerly down-stream port warden's line on the Berkley side to govern the direction of the piers. This line was probably chosen because it was more nearly at right angles with the center line of the bridge than either of the other two port warden's lines. It will be noticed that the third condition of the permit, while requiring a change in the direction of the line of the piers, did not require a change in the center line of the bridge. The result was that the transverse axis of the bridge could not be parallel with the line of the piers. As a matter of fact, the angle of the piers to the transverse axis of the bridge as constructed was approximately 2 degrees and 31 minutes.

It is claimed that certain harmful consequences followed from this arbitrary choice. The testimony tends to show that the piers are erected at an angle of 7½ degrees to the natural channel of the river; whereas the assumed port warden's lines shown on the drawings accompanying the application for the permit were parallel to the channel. Had the port warden's line on the Norfolk side of the river been selected, the angle of the piers to the channel would have been only about 3½ degrees. In addition, the western opening of the draw used by ships ascending the river, is brought 7½ degrees nearer to the Norfolk shore than if the assumed port warden's lines had been selected. This departure, however, from the original plans, is relatively unimportant in this case, because it does not appear that it figured in either accident under consideration. There is no evidence to justify the finding that the current of the river, or such difficulty of navigation as was caused by the direction of the opening of the span, contributed to either collision.

It is contended in the second place that the bridge varies from the 1916 plans, in that the distance between the center lines of the bascule piers on either side of the draw was increased from 168 to 169 feet 8 inches, and at the same time the distance from the center line of each of said piers to the line of fenders protecting it was increased from 14 feet to 14 feet 10 inches. This change was brought about by a mistake on somebody's part in the length of the radius of the quadrant racks. It was supposed by the engineers of the bridge company that the radius of the racks or the distance from the trunnions or pivots of the bascule leaves to the edge of the gear teeth would be 14 feet. But the steel as delivered measured 14 feet 10 inches at this point. The general plan submitted with the 1916 application shows that the fenders are exactly in line with the gear racks when the leaves are in an upright position. The increase of 10 inches in the radius of each quadrant rack would have caused the gear teeth to overhang the fenders by 10 inches on each side. The result would have been that, whilst there would have remained a clear opening of 140 feet between the fenders at the height of the fenders, the opening would have been 20 inches less at the level of the gear racks, some 30 feet above. This situation was so obviously dangerous and improper that the bridge engineers and the district engineer agreed that the piers should be set back 10 inches on each side, and this was done. Here again, however, the change in the plans of the bridge is of itself immaterial, because it in no wise contributed to either accident. It is significant, however, in connection with the final difference between the approved plans and the erected bridge, which will now be discussed.

The important and significant particular in which the bridge, as constructed, differed from the plans submitted to the Secretary of War consisted in the overhang of two of the gear racks in relation to the row of piles constituting the fender system beneath. It has been noticed that the third condition, upon which the permit was granted, specified that there should be a clear width of opening between the fenders of not less than 140 feet, measured at right angles to the port warden's lines, and that all the piers of the bridge should be parallel to these lines. The piers and fenders were in fact installed parallel with one of the port warden's lines on the Berkley side, and the clear distance between the fenders, at the height of the fenders, when measured at right angles, was 140 feet as described. But, since the direction of the center line or longitudinal axis of the bridge was not changed, it resulted that the piers were not built at right angles to the center line of the bridge, but at an angle of 87 degrees 29 minutes thereto. In other words,

the gear racks were built at an angle of 2 degrees 31 minutes to the line of the piers.

It was in fact impossible to comply literally with the requirements of the permit. The plans show that the gear racks, when raised, were even with or shoreward of the line of fenders, and that they were spaced 140 feet apart. There was no provision in condition 3 that this distance or relative position should be changed, but there was a requirement that the lines of the piers should be changed, so as to make them parallel with the port warden's line. When the piers were thus placed askew to the gear racks, the latter at diagonal corners projected beyond the line of the fenders beneath. This would have been the case, had the imaginary port warden's line, shown on the drawings, been followed. As a matter of fact, when the port warden's line on the Berkley side was adopted to govern the construction of the piers, there resulted an overhang at the southeastern and northwestern gear racks of 5 or 6 inches. This matter was brought to the attention of the chief engineer of the bridge corporation by his assistant as deserving serious consideration, but no attempt was made to meet the difficulty. It has already been pointed out that the bascule piers were moved back some 10 inches on each side in order to accommodate the error in the size of the quadrant racks. Had they moved apart an additional 6 inches on each side, the overhang of the gear racks would have been avoided.

■ The question arises as to whether the bridge as built deviated in this particular from the conditions of the permit. It has been urged that the permit was complied with, because there was a clear opening between the fenders of 140 feet, measured at right angles to the port warden's lines; that is to say, at right angles to the fenders or to the piers. But, whilst this language of the permit was observed, the spirit of the third condition and of the plans was violated. They did not show any overhang of the gear racks; and it was a material departure from the plans and from the requirements of safe navigation to diminish the opening above the fenders and increase the chance of collisions between the steel work of the bridge and the superstructure of passing vessels. The case of Hannibal & St. Joseph R. Co. v. Missouri River Packet Co., 125 U. S. 260, 8 S. Ct. 874, 31 L. Ed. 731, furnishes an interesting and apt comparison. See, also, the decision of Judge Pritchard in the Nannie May (C. C. A.) 266 F. 484, at 487, as to the increase of the dangers of navigation by overhanging projections.

The evidence shows, as the dictates of common sense would seem to require, that it is the approved practice to design a bascule bridge in such a manner that when it is fully opened, the outermost portion of the steel is outside a line drawn vertically from the fenders. The requirements of the War Department of a clear channel width undoubtedly mean a clear width at any height above the water line. The situation could easily have been met by increasing the distance between the bascule piers. If such action was such a material departure from the general plan as to constitute a modification requiring the approval of the Secretary of War under the terms of section 1 of the General Bridge Act, it was the duty of the parties to secure a formal permit. If, on the other hand, it was merely a minor detail, which might be determined in the discretion of the builder in order to make the bridge conform with the plans, as the parties seem to have concluded when the distance between the piers was increased from 168 feet to 169 feet 8 inches, as above pointed out, steps should have been taken to correct the defect.

■ The bridge corporation does not deny that there was an overhang of the gear racks when the bridge was built in 1916, but it takes the position that this construction was approved in effect by the Secretary of War. It was, of course, impossible for the Secretary or the Chief of Engineers to attend to all of the details. The construction is supervised in practice by the district engineer, who is an officer of the United States Army, and thus a representative of the War Department. The district engineer, or his assistants, were constantly on the work during its construction, and checked it up after its completion. No complaint was ever made by the War Department that the bridge did not conform with the permit, and no directions were ever received to correct the overhang. Nevertheless, all of these matters, taken together, do not suffice to cure the illegality in the construction of the bridge. The district engineer and other subordinates of the War Department had no authority to authorize a modification of the plans attached to the permit. The terms of the General Bridge Act are clear that this authority is vested in the Secretary of War and Chief of Engineers. Discretion is doubtless lodged in the permittee and the district engineer as to the manner in which the terms of a permit are carried out, but neither one nor the other may alter the plans themselves. If by oversight or otherwise a material departure from the general plan is approved by the district

engineer or his assistants, the responsibility of the bridge owner is in no way affected.

■ The bridge corporation further argues that certain letters which passed between its engineer and the district engineer during the early part of 1924 prove that the bridge was constructed in 1916 in accordance with the permit. The engineer of the bridge on February 1, 1924, wrote the district engineer and referred to the permit of 1916, the completion of the bridge in May, 1918, and the measuring and checking of the bridge at numerous times thereafter by the United States Engineering Department of the district. He said that the bridge corporation had never received notice that the checks and measurements satisfy the conditions imposed by the United States; that the draw span opening was measured on January 3, 1924, by the representatives of the district engineer's office, and found to fulfill the conditions of the permit. The letter requested a statement from the War Department on the point. To this letter the district engineer replied (as was the fact) that on January 10, 1924, he had reported to the Chief of Engineers that the bridge had been completed in accordance with the approved plans. This correspondence, however, is not conclusive. It indicates quite clearly the opinion of the district engineer, but this is of no avail since, as has been shown, it is not in accordance with the facts.

In the next place, the bridge corporation contends that there is evidence proceeding from the Secretary of War himself that the bridge, as constructed in 1916, complied with the plans. It consists of a recital by the Secretary in a permit issued by him on April 26, 1924, for a modification of the bridge, that the acts of Congress of 1915 and 1916 authorized the bridge corporation to construct the bridge in accordance with the provisions of the General Bridge Act, and that the bridge was constructed as authorized. It is insisted that this statement was not merely a declaration that the bridge conformed to the permit of 1916, but a lawful subsequent ratification of the bridge as built. Texas & P. Ry. Co. v. Angola Transfer Co. (C. C. A.) 18 F.(2d) 18. On the other hand, it is contended that the General Bridge Act does not give authority to the Secretary of War to approve a bridge after it is built, but limits his authority to the approval of plans before the bridge is commenced, or the approval of a modification of plans before the modification is commenced. It is at least doubtful whether the recital is intended to say more than that the bridge was authorized by the special acts of Congress, without reference to its conformity to the plans. But it is unnecessary to decide that question in this case. Nor is it necessary to determine whether in any case, a bridge built unlawfully without prior approval of the Secretary of War may be made lawful by his subsequent ratification. The circumstances surrounding the application and the permit of 1924 make it perfectly clear that the bridge was modified with the approval of the Secretary in such a way that the defect in the 1916 construction was cured.

■ On January 5, 1924, a survey of the bridge was made and a written report submitted to the district engineer. It showed that with both sides of the draw raised to a maximum elevation, the distance between the faces of the opposite rocker gears was 140 feet on both the up and downstream sides of the bridge, and that the distance between the faces of the fenders was 142.7 feet at the down stream end, 142.7 feet at the center line of the bridge, and 144 feet at the upstream end. On February 26, 1924, the engineer of the bridge corporation wrote to the district engineer, stating that due to the depth of the water and the contact from passing boats during the six years since the bridge had been built, the fenders had been pushed back until the clearance between them was about 142 feet; that the fenders required strengthening to guarantee the safety of ships, and that on account of the location of the piers, it was impossible to do fender construction from the rear. Permission of the War Department was therefore requested to repair and replace the fender system, in accordance with plans accompanying the letter. The permit of April 28, 1924, followed, whereby the application was approved. The important modification was that the average opening between the fenders of 142 feet then existing was reduced to 139 feet. The sketch depicts the bridge as modified in both a closed and an open condition, and shows that with the leaves of the bridge raised, no part of the steel structure extends channelward of the line of the fenders. A precise calculation shows that with an opening between the fenders of 139 feet, the northeast and southeast racks should be approximately flush with the fender lines, while the other racks would be some inches back therefrom. The plans thus provided for the elimination of the overhang of the quadrant racks. The deviation in 1916 from the terms of the permit therefore became relatively unimportant. If the bridge corporation complied with the permit for the modification in 1924, and

maintained the bridge in this condition, then it was a lawful structure in that feature of its construction which it is claimed brought about the two collisions.

The opponents of the bridge, however, set up the claim that according to the evidence, the terms of the permit of 1924 were not complied with. The evidence shows that the old piling was not removed, but the new piling, together with certain sheathing, was bolted to the old. The combined width of the new fenders and sheathing was 3 feet. If the position of the old piling, as it was disclosed by the survey of January 5, 1924, was not changed, then the clear opening between the fenders did not comply with the permit, because it would be 139 feet 7 inches on one side of the bridge and 141 feet on the other. The testimony, however, does not sustain this position. The work was done under the supervision of the district engineer. There is definite testimony by the bridge engineer, in charge of the work, that the opening as constructed was 139 feet in width, and that the new piles were lined up with the footing of the old so that the measurements and locations of the new fender were true. The evidence shows that the footing of the old piling was at the base of the bascule piers and consequently was stationary. The piers tapered toward the top, so that, in the original construction, the tops of the fender piling were at a material distance channelward from the tops of the piers. The wear and tear of passing vessels had pushed the tops of the piles towards the fenders. There are some expressions in the evidence of the bridge engineer that the new piling was applied to the old at the same line and the same angle, but it is unreasonable to infer from this testimony that the old piling was not restored to its original position before the new work was attached. The court finds, as a conclusion of fact, that the requirements of the permit of 1924 were complied with.

■ This conclusion, however, does not dispose of the case so far as the bridge corporation is concerned, nor indicate that the bridge was a lawful structure when the collision occurred. On the contrary, the application for the 1924 permit emphasizes the fact that the bridge corporation had notice that the fender piles were subject to wear and tear and were apt to be displaced, so as to widen the opening and create an increase in overhang of the gear racks. This condition called for particular care and attention on the part of the operators of the bridge. It is conceded that the fender system was not of great service in warding off vessels from contact with the bridge. The location of the piers was such that with a clear opening of 139 or 140 feet between the fenders, it was not possible to reinforce them. So clearly was this condition understood, that it is one of the contentions of the bridge corporation in this case that it was well known in shipping circles in Norfolk that the fender system could not be depended upon to warp a vessel through the opening, but served only to mark the channel. It was clearly the duty of the bridge corporation, under these circumstances, to maintain the opening between the fenders at the distance specified in the permit—that is to say, 139 feet—and to restore the fenders to the proper position should they become pushed back by passing vessels. To do otherwise was to invite disaster. Section 4 of the General Bridge Act expressly provides that no bridge erected under the provisions of the act, shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed. The decision of Judge Rose in this circuit in Southern Transportation Co. v. P., B. & W. R. Co. (D. C.) 196 F. 548, at 550, which was affirmed per curiam by the Circuit Court of Appeals in 205 F. 732, emphasizes the necessity for properly placed piles. The experience of the bridge corporation, as well as the express provisions of the law, required careful oversight in this particular.

The condition of the bridge on December 28, 1926, when the first collision occurred, shows that the bridge was not so kept as to maintain the alignment of the fenders with the gear racks. A survey which was made shortly after the accident shows that on the western or downstream side of the opening, the distance between the fenders was 140 feet 3 inches while on the upstream or eastern side, with which the Poljana first collided, the opening was 141 feet 6 inches. The overhang of the gear racks on the Norfolk side at the eastern opening of the bridge, at a point 30 feet above the water which the Poljana first struck, was 14 or 15 inches, while there was a similar overhang at the western opening on the Norfolk side of 12 inches.

The evidence shows that the condition of the bridge was next formally inspected and surveyed on or about July 30, 1927. On that date, a hearing was held by the district engineer at Norfolk in respect to the condition of the bridge, as the result of the complaint of the towing corporation and other shipping interests at that port. A day or two before the hearing, an inspection and survey, accompanied by a drawing of the opening of

the bridge, was made by the district engineer and his assistant. It was apparent from personal observation without measurements that there was an overhang of the gear racks on the Norfolk side of the span. Accurate measurements showed that the eastern gear rack on the Norfolk side projected 16 inches, and the western gear rack on that side 15 inches, over the outline of the fender system. On the Berkley side, the eastern gear rack was approximately flush with its fender system, while the western gear rack was some inches outside or shoreward of the line of the fenders. The hearing was held over the objection of representatives of the bridge corporation present, who were fearful that the outcome of the legal proceedings in regard to the Poljana collision might be affected. But the hearing nevertheless proceeded. The engineer testified at the hearing of the case at bar that, as the result of his observation of conditions as they then existed, the bridge constituted a menace to navigation, since it was contrary to all reason in the use of fenders to allow the gear racks to extend beyond them.

On August 22, 1927, the successor of this official submitted a report to the War Department, based on the hearing and the data that had been collected. An accompanying drawing shows that, on the Norfolk side, the projection of the eastern rack was 16 inches and of the western rack 15 inches, and that the racks of the southern or Berkley bascule fell shoreward of the fender. The report stated that the Norfolk fender was not fully adequate for safe passage of vessels through the opening or for the protection of the bridge, but that the southern fender was satisfactorily serving its purpose and did not require alterations or repairs except possibly of a minor character. Certain drawings for changes in fenders were attached. The report concludes with the statement that the bridge corporation had requested that action on the matter be deferred until its suit against the Wood Towing Corporation should be disposed of.

No repairs or changes were made in the system prior to the second collision which took place between the West Alsek and the bridge on October 10, 1927. Immediately after that accident, another survey was made with particular reference to the Berkley side of the bridge. It was found that, with the southern leaf in a raised position, the upstream eastern rack extended 5½ inches over the fender piling, while the downstream western rack stood 7 inches outside the fender piling. The distances between the fenders was also ascertained during the month of October, and it was discovered that the opening was 140 feet 8½ inches on the downstream side, 140 feet 8½ inches at the center line, and 142 feet 7 inches at the upstream side of the bridge.

On October 27, 1927, the bridge corporation presented an application to the Secretary of War to modify the bridge, in accordance with certain plans and specifications for fenders accompanying the application. It called attention to the two accidents in this case, stating that the purpose of the application was to safeguard the draw from collisions in the future. This application was followed by the grant of a permit to do the work. These papers are properly objected to by the bridge corporation, on the ground that they are inadmissible to show negligence on its part in the construction or maintenance of the bridge at the time of the collisions. It is clearly established by the case of Columbia & P. S. R. Co. v. Hawthorne, 144 U. S. 202, 12 S. Ct. 591, 36 L. Ed. 405, that a subsequent alteration or repair of a machine by the defendant is not competent evidence of negligence in its original construction, in an action for injury caused by the machine. The evidence, however, has been received merely as tending to show the position of the fenders at the time of the second collision. The drawing discloses that, with the new fender system, the proposed opening was 130 feet, while the existing opening was 142 feet.

It is the conclusion of the court, from the facts thus found, that at the time of the Poljana collision, in December, 1926, and at the time of the West Alsek collision, in October, 1927, the bridge was an unlawful structure in respect to those portions of it with which the ships came in contact. It is fundamental, as a general proposition of law, that any obstruction to navigation is unlawful, since the public is entitled to the unobstructed use of every part of a navigable river. Georgetown v. Alexandria Canal Co., 12 Pet. 97, 9 L. Ed. 1012; Clement v. Metropolitan West Side El. Ry. Co. (C. C. A.) 123 F. 271. Furthermore, the matter is regulated by the Act of Congress of March 3, 1899, 30 Stat. 1151; 33 USCA § 403, which declares that the creation of any obstruction not authorized by Congress to the navigable capacity of any waters of the United States is prohibited. The bridge, having cited the special acts of Congress and the permits of the Secretary of War as justifying its existence, has the burden of proof to show that,

in its erection and maintenance, it conformed to the requirements, for grants of this kind against the public right must be strictly construed. Pa. R. Co. v. Baltimore & New York Ry. Co. (C. C.) 37 F. 129; Thom v. City of South Amboy (D. C.) 236 F. 289; Texarkana & Ft. S. Ry. Co. v. Parsons (C. C. A.) 74 F. 411; Hannibal & St. J. R. Co. v. Missouri River Packet Co., 125 U. S. 260, 8 S. Ct. 874, 31 L. Ed. 731.

The overwhelming weight of the evidence indicates that the bridge has failed to meet this burden and is subject to the legal consequences of its failure. What they are is set out with precision, for the purposes of this case, in the decisions of the Circuit Court of Appeals for the Fourth Circuit in The Cromwell, 259 F. 166; Savannah & N. Y. Transportation Co. v. Klaren Bridge Co. (C. C. A.) 252 F. 499. It is there laid down that the official approval by the government of the construction of the bridge is conclusive that the bridge is a lawful structure, although it interferes with navigation, and, if a moving vessel collides with the bridge, there is a presumption of negligence on the part of the vessel, which must approach the bridge with reasonable skill and care to avoid injuring it, having in mind the difficulty and peril occasioned by the bridge itself. On the other hand, the rule as to a bridge which is an unlawful obstruction to navigation is different. While such a structure may not be injured negligently by a passing vessel with impunity, nevertheless the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury. The bridge owner is entitled to recover from the ship only if he can show that the failure to comply with the law was in no way responsible for or contributed to the accident or disaster.

It will appear hereafter, from the discussion of the details of the navigation of the ships at the time of the respective collisions, that the bridge company has failed in this case to show that the overhang of the fenders did not contribute to bring about the collision. It is therefore unnecessary to decide whether or not a stricter rule should be applied, namely, that it is incumbent upon the bridge to show that the defects therein *could* not have caused the collision, in analogy with the rule laid down in Belden v. Chase, 150 U. S. 699, 14 S. Ct. 264, 37 L. Ed. 1218, that when a vessel has committed a positive breach of statute, she must show, not only that probably her fault did not contribute to the disaster, but that it could not have done so.

The Poljana was a ship 360.7 feet long and 52.2 feet beam. On December 28, 1926, she was in tow of the tug C. H. Hix, whose master, an experienced navigator, had complete control of the navigation of the flotilla. The weather conditions were ideal. There was an ebb tide, the set of which was toward the Norfolk shore, and would tend to carry a vessel passing westwardly through the draw, as did the Poljana, toward the pier on the north side of the river. There is some conflict in the testimony as to the course and direction of the wind. The captain testified that in his opinion the wind was a 10 or 12 mile breeze from the southwest, but the records of the Weather Bureau in the city of Norfolk, at a point one mile from the scene of the collision, show that the wind was from the northeast and was very light—not more than 3 to 5 miles an hour. The last-mentioned testimony must be accepted as correct, under the circumstances, because, although the direction of so slight a breeze might vary between the two points, the breeze could not have been so strong as the captain believed it to be.

His account of the matter is that he approached the bridge with the tug Hix on the port bow of the ship. It was necessary to stop the ship, as they approached the bridge, to wait for it to open. When it was ready, the ship was about one length from the bridge. Her engines were put half ahead and her helm hard aport, while the engines of the tug were put in reverse. The purpose of this maneuver was to hold the ship straight, and overcome the influence of the tide, which tended to send her stern toward the Norfolk side, especially after the fore part of the ship had entered the opening of the bridge and was sheltered by its fenders. As the ship entered the opening, she was headed a little to the south of the center of the opening. When her stem reached the bridge, the tug's engines were stopped. The ship was then in good position, and there was then barely room enough for the Hix to clear the piling on the Berkley side. At or about that time, the captain noticed that there was a sheer of the stern of the ship toward Norfolk side. He then put the engines of the ship full ahead, keeping the helm hard aport and the tug's engines idle. But the movement of the stern of the ship was not sufficiently checked, and a small iron house

on the deck of the ship came in contact with the eastern gear rack on the Norfolk side. The only damage to the ship was a dent in the forward side of the house, just at the corner, about 3 inches from the edge. There was a second collision between the house and the western gear rack on the Norfolk side. There is evidence on behalf of the bridge to the effect that, whilst the ship was in the draw, the engines of the tug were working in reverse, and that the effect of this was to bring the stern of the ship into collision with the bridge. This testimony is denied by the captain and other members of the crew of the tug. It is not necessary to determine the issue thus joined, for the reason that, under the weather conditions prevailing, it is impossible to hold that the captain of the ship was free from negligence in preventing a collision between the vessel and the gear racks of the bridge. There is no doubt that he had been warned that the bridge was a dangerous structure. The evidence on behalf of the towing corporation is conflicting as to the precise knowledge which the corporation had of the overhang of the gear rack, but the weight of it clearly indicates that the president of the towing corporation regarded the bridge as a menace to navigation, and had so notified his captains, and cautioned them to be specially careful in passing through it. He told them that the fender piling was inadequate, and that there might be an extension of the gear racks beyond the fenders. A number of communications had passed between the towing corporation and the bridge corporation, in which the president of the former had vigorously and indignantly complained of the dangerous condition of the bridge, and especially of its fenders and overhanging gear racks. Having been warned of the danger, it was obviously the duty of the captain of the tug to keep the ship at a safe distance from the piling and the steel superstructure of the bridge. Ships of small and large dimensions had been safely taken through the opening on many prior occasions, and there was nothing in the weather conditions to prevent a safe passage on this occasion, had the navigator exercised due care. It is true that the illegal character of the bridge precludes the presumption of negligence on the part of a moving ship, which strikes a bridge or other stationary object; but, even in the absence of presumption, the fact remains that the bridge was stationary, and the captain had only to avoid it, as he had successfully done on many prior occasions.

It does not follow that the accident should be attributed entirely to the negligence of the tug, for the condition of the bridge, as has been pointed out, had created a dangerous situation. It is contended, on behalf of the bridge, that in any event the sole blame should be placed upon the tug, because it had the last clear chance to avoid the accident, and its navigator knew, or should have known, of the dangerous condition of the passage. The circumstances, however, do not justify an application of this doctrine. That the master of the tug had notice of the danger in a general way is beyond dispute. But, on the other hand, he did not have, and was not required to have, precise information as to the extent to which the steel work of the bridge impeded the channel. While the conditions were favorable, it was not child's play to conduct a flotilla through the opening. The navigator of the tug was obliged to rely to some extent upon the lines of the fenders, and, since the projecting gear racks were some 30 feet above, it was difficult, if not impossible, for an observer in a moving vessel to determine the precise relation of the parts of the structure. The evidence indicates that, had there been no overhang, the collision would not have taken place.

It was suggested during the hearing that the stern of the ship was cut away in its construction, and that it was possible for the house upon its deck to come in contact with the steel structure of the bridge without contact between the hull of the ship and the fenders. But this explanation will not serve, in the opinion of the court, for the reason that there was no injury to the rail or other superstructure of the ship; the only mark upon it being a slight dent in the iron house 3 inches inboard from the rail of the ship. Had the ship hung over the fenders, there would unquestionably have been, in either the first or second collision, a substantial injury to some portion of the vessel. Under all the circumstances, it is the conclusion of the court that both parties were at fault.

That which has been said applies with equal force in many respects to the liability of the bridge corporation and the towing company for the West Alsek collision. This also took place under most favorable weather conditions; there was little or no wind. Some dispute has arisen as to whether the tide was slack, or was flood. In the latter case, the effect upon a ship entering the draw from the west, as did the West Alsek, would be to set it toward the Berkley side, with which it collided. Even if the tide were

flood, as the captain of the Peerless believed, the conditions were equally as good as those which attended the passage of many hundreds of ships safely through the draw.

There were three vessels in the flotilla, the ship, the tug Peerless, of the towing company, whose captain had charge of the flotilla, and the tug Stallion, furnished without responsibility by the Fleet Corporation. The dimensions of the vessels were as follows: West Alsek, 409.6 feet long, 52.4 feet beam, 27.1 feet deep; Peerless, 109.6 feet long, 25.2 feet beam, 13 feet deep; Stallion, 94.5 feet long, 24.8 feet beam, 12 feet deep. The account of the accident given by the captain of the Peerless was substantially as follows: The ship had no steam up. She was taken from the docks of the Newport News Shipbuilding Company, which lay to the west of the bridge. The tug Peerless was placed on the port quarter of the ship, and the tug Stallion on the starboard quarter. When the flotilla arrived above one-half mile west of the bridge, the Stallion was instructed to let go and came under the port bow of the ship. While she was making this maneuver, the engine of the Peerless was stopped and her helm was put to starboard. After the ship, as the result of the change of the helm of the Peerless, took a light swing to the Norfolk side, the helm of the Peerless was put hard aport and her engines half speed ahead. The captain was endeavoring to ascertain how much control the Peerless had over the stern of the ship. By the time the ship had come within two lengths of the draw, the Stallion had made fast to her port bow. The ship was being held pretty well to the north side of the river, and, when she was within 200 feet of the draw, her bow was pointed towards the western wing of the fender system on the Norfolk side—that is, too far north to enter the draw. The Stallion was then ordered to go ahead on her engines. By this means the bow was shoved over so that, when the ship entered the draw, she was about the center and nearly parallel with the line of the opening. The engines of both tugs were stopped before the ship entered the draw.

As the flotilla went through the draw, the captain noticed that the ship was sagging to the south. This was not unexpected, because of the effect of the flood tide. The ship safely passed the western gear rack. When her stem had passed some 75 to 100 feet beyond the eastern gear rack, the captain of the tug inquired of the captain of the ship, who was standing at the extreme starboard side of the flying bridge, as to how conditions were on the starboard side, and was told that the vessel was clear, but close to the fenders. A few seconds later, a collision took place between the teeth of the gears of the eastern rack and the underside of the flying bridge, which is located about 125 feet abaft the stem of the ship. The helm of the Peerless was immediately put hard aport and her engines full ahead, so as to throw the afterpart of the ship clear of the bridge. Although the captain noticed the sag to the south, he made no effort to start the engine of either tug before the collision, believing that the ship would clear the bridge, as she was moving ahead some two miles an hour. The accident happened at 4:04 p. m.

Testimony on behalf of the bridge tended to show that the ship entered the draw south of the center and at an angle to the opening, her stern inclined toward the Berkley side. Expert testimony was also offered to prove that the disposition of the tugs was negligent; that there should have been one tug forward and one tug aft on either side of the ship, so as to keep her under better control, and, furthermore, that, when the sag of the ship to the south during her progress through the draw was noticed, some step should have been taken, by setting the engines of the tugs in motion, to stop the sheer and prevent the collision. It would serve no good purpose to enter into a discussion of the several theories of navigation which were offered in evidence. Eliminating from consideration the presumption of negligence on the part of a moving ship in collision with a stationary bridge, there still remains the unexplained fact that under well-nigh perfect conditions, the captain of the flotilla permitted it to come in contact with the bridge. Had there been no notice of the overhang of the iron gear rack on the Berkley side, it would perhaps be incumbent upon the court to hold that the bridge was solely to blame. But the captain of the tug had had frequent warnings about the dangerous character of the bridge, and was, of course, well acquainted with the disaster of December 28, 1926, in which his employer was involved. The conclusion is that the master of the tug had good reason to keep at a greater distance from the Berkley pier, and by the exercise of due care would have been able to do so, but failed in the performance of this duty.

Here again the entire blame cannot be placed upon the tug. The bridge corporation, as well as the towing company, had

knowledge of the dangerous conditions. The public hearing in July, 1927, and the recommendations of the district engineer as to the change in the bridge had recently taken place. It is true that it was indicated that the Norfolk rather than the Berkley side of the bridge was in need of attention; but the survey showed that the eastern gear rack was flush with the fender line on the Berkley side, and the experience of the corporation had demonstrated that constant care was required to prevent the widening of the space between the fenders, and the consequent overhang of the quadrant racks. The combined width of the three vessels, had the tugs been placed on opposite sides of the ship, as the experts for the bridge contend, exceeded 102 feet. This would have left a clear space of less than 20 feet on each side for the passage of the vessels. Since such a passage was to be expected in the ordinary course of business, it was obviously the duty of the bridge corporation to maintain a constant supervision and see that there was no overhang of the racks. That which existed at the time of the second accident was only 5 or 5½ inches; but the margin between the catastrophe and a safe passage in this instance was a matter of inches. There was no contact between the hull of the ship and the fender piling. The navigator in charge of the ships had no means of knowing from passing observation the precise conditions which he had to meet, and it is therefore reasonable to conclude that he was not solely to blame for the catastrophe, but that the neglect of the bridge contributed to it.

The United States is entitled to be paid the amount of the damages to the West Alsek, when they shall have been determined, out of the fund in the proceedings for a limitation of liability of the tug Peerless.

The question remains as to whether the bridge is entitled to recover one-half its damages to the extent of the balance of the fund arising from the proceeding in the Peerless Case, and also to be paid one-half its damages occasioned by the Poljana collision to the extent of the fund created in the proceedings for limitation of liability in regard to the tug C. H. Hix. The contention of the towing company is that the injuries to the bridge by the tugs, if actionable at all, give rise only to actions for negligence at common law, and that the bridge is not entitled to recover because of its contributory negligence. On the other hand, it is the position of the bridge corporation that, since it has been obliged, on the petition of the towing corporation, to file its claims in admiralty proceedings, it is entitled to the application of the admiralty rule of divided damages.

The precise question has not been decided, so far as the researches in this case disclose. Its solution is the more difficult because the cases which relate to the general subject do not seem to be harmonious. If we are to be guided by the rule seemingly announced in Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619, and Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218, there is little doubt that the admiralty rule for the division of damages should be applied. Belden v. Chase was an action at law brought by the owner of a steamboat against the owner of a yacht for damages arising from a collision between the two vessels. The court said at page 691 of 150 U. S. (14 S. Ct. 269):

"The doctrine in admiralty of an equal division of damages in the case of a collision between two vessels when both are in fault contributing to the collision, has long prevailed in England and this country. The Max Morris, 137 U. S. 1 [11 S. Ct. 29, 34 L. Ed 586]. But at common law the general rule is that, if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages for injuries so caused. Atlee v. Packet Co., 21 Wall. 389 [22 L. Ed. 619]."

Atlee v. Packet Co. was a libel in admiralty, brought by the owner of a barge against the owner of a pier erected in the Mississippi river, for damages arising from a collision between the barge and the pier. The court said at page 395 of 21 Wall.:

"But the plaintiff has elected to bring his suit in an admiralty court, which has jurisdiction of the case, notwithstanding the concurrent right to sue at law. In this court the course of proceeding is in many respects different and the rules of decision are different. The mode of pleading is different, the proceeding more summary and informal, and neither party has a right to trial by jury. An important difference as regards this case is the rule for estimating the damages.

"In the common-law court the defendant must pay all the damages or none. If there has been on the part of plaintiffs such carelessness or want of skill as the common law would esteem to be contributory negligence, they can recover nothing. By the rule of the admiralty court, where there has been such contributory negligence, or in other words, when both have been in fault, the entire damages resulting from the collision must

be equally divided between the parties. This rule of the admiralty commends itself quite as favorably in its influence in securing practical justice as the other, and the plaintiff who has the selection of the forum in which he will litigate, cannot complain of the rule of that forum."

Similarly it may be said in the case at bar that, since the towing company could have presented its defense in the law court to an action brought by the bridge corporation, but preferred to institute limitation proceedings in admiralty, it has no just cause for complaint if the admiralty rule for the division of damages is applied.

The principle laid down in these cases has been recently followed in the Second circuit in the case of Johnson v. U. S. Shipping Board (C. C. A.) 24 F.(2d) 963, which was an action at law to recover for personal injuries sustained by the plaintiff while seeking employment as a ship's carpenter on board a ship. There was a judgment for the defendant, which was attacked on the ground that the District Court instructed the jury that the plaintiff could not recover if he was guilty of contributory negligence. It was held that the instruction was correct, and that the common-law rule of contributory negligence controlled, even though a maritime tort was involved. The decision was based upon Belden v. Chase and Atlee v. Packet Co., supra. It expressly repudiated a dictum of the same court in Port of New York Stevedoring Corporation v. Castagna (C. C. A.) 280 F. 618, where damages were recovered by a stevedore's employee in an action at law for negligent injury inflicted on board a ship. The trial court charged the jury that, if the plaintiff was guilty of contributory negligence, such negligence only went to the question of reduction of damages. There was really no evidence of contributory negligence, and the question was therefore academic; but Judge Mayer, speaking for the court, said:

"The right to recover irrespective of contributory negligence is a right, and not a matter of procedure, nor is it governed by the choice of the forum. In the case at bar, plaintiff has sought his remedy at common law to obtain redress arising out of a maritime tort. He entered the common-law court with the same right as he would have entered the admiralty court. That was the right to recover, irrespective of his own negligence, provided, of course, he could show the negligence of his employer, and this right of plaintiff sprang into existence because he suffered a maritime tort."

If this declaration is out of harmony with the rule announced in Atlee v. Packet Co. and Belden v. Chase, it nevertheless seems to accord with the decision of the Supreme Court in the more recent case of Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171. A seaman, injured while at sea, instituted a common-law action, claiming that his injuries resulted from the negligence of a superior officer, and demanded full indemnity for the damage sustained. It was held that he was only entitled to recover in accordance with the principle of general maritime law, that a vessel owner is liable only for the maintenance, care, and wages of a seaman injured in the service of the ship by the negligence of a member of the crew. Consideration was given to section 9 of the Judiciary Act of 1789, whereby District Courts of the United States were given exclusive original cognizance of all civil causes of admiralty jurisdiction, "saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it." Judicial Code, §§ 24, 256; 28 USCA §§ 41[3], 371. The court said (page 384 of 247 U. S. [38 S. Ct. 504]):

"The distinction between rights and remedies is fundamental. A right is a well founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury. Bouvier's Law Dictionary. Plainly, we think, under the saving clause a right sanctioned by the maritime law may be enforced through any appropriate remedy recognized at common law; but we find nothing therein which reveals an intention to give the complaining party an election to determine whether the defendant's liability shall be measured by common-law standards rather than those of the maritime law. Under the circumstances here presented, without regard to the court where he might ask relief, petitioner's rights were those recognized by the law of the sea."

Very recently the Supreme Court of Appeals of Virginia applied this rule in Colonna Shipyards, Inc., v. Bland, 143 S. E. 729, in the case of a mechanic injured on board ship through the neglect of his employer. See, also, Grimberg v. Admiral Oriental S. S. Line (D. C.) 300 F. 619, 620.

The distinction between rights and remedies was recognized in this circuit in the case of Long v. Atlantic Coast Line R. Co. (C. C. A.) 238 F. 919, where an action for personal injuries, received in the state of Georgia, was brought in the United States District Court for the Eastern District of South Carolina. In the former state a statute provides that,

if both parties are in fault in an injury by a railroad, the complainant may recover, but the damages shall be diminished in proportion to the amount of his fault, whereas in South Carolina such a case is governed by the common-law rule of contributory negligence. It was held that the law of the state of Georgia should govern. The cases cited show that the ruling was based upon the general principle that a right of action for an injury is to be determined by the law of the place of the injury, and that it is only in matters of procedure or remedy that the law of the forum controls.

In Western Fuel Co. v. Garcia, 257 U. S. 233, 42 S. Ct. 89, 66 L. Ed. 210, it was said that a suit to recover for the death of a person cannot be maintained in admiralty under the general maritime law, but only by reason of the statutes of the state where the death occurred, and consequently in such cases the rules prescribed in such statutes in regard to the action should be observed. See, also, Roswall v. Gray's Harbor Stevedore Co., 138 Wash. 390, 244 P. 723, 50 A. L. R. 445. Conversely, it was held in Engel v. Davenport, 271 U. S. 33, 46 S. Ct. 410, 70 L. Ed. 813, that in an action at law brought by a seaman in a state court, under the authority of the Merchant Marine Act, to recover damages for personal injuries arising from unseaworthiness of the vessel and defective appliances, the suit must be governed by the provisions of the federal statute.

Some disagreement is found in the decisions of the admiralty courts, when the amount of damages rather than the right of the injured party to recover is the question involved. In such cases as Galef v. U. S. (D. C.) 25 F.(2d) 134, and Royal Mail Steam Packet Co. v. Companhia De Navegacao Lloyd Brasileiro, Almirante-Jacequay-Silarus (D. C.) 27 F.(2d) 1002, 1928 A. M. C. 983, it was held that the rule for an equal division of damages in case both parties are in fault should be applied in an admiralty court of the United States, although the injury occurred in the waters of a foreign country, whose law prescribes a different proportionate division. On the other hand, it was held in The Eagle Point (C. C. A.) 142 F. 453, that the foreign law should be followed, since, in the opinion of the court, such rules relate to the rights of the parties and not merely to the remedies.

■ This extended consideration of the cases has been given, because they suggest that it is no longer safe to suppose that the right of the plaintiff to recover in case of mutual fault depends entirely upon whether the action is brought in an admiralty court. It is clear that, in an action of negligence at common law, absence of neglect on the part of the plaintiff is an essential element of the right of action. It affects the right, rather than the remedy, of the plaintiff. It is beyond dispute that, if the bridge corporation had been permitted to proceed with its action at law, no recovery could have been had, if it had transpired that neglect on its part had contributed to the injury. It would seem to follow logically that, when the common-law action is enjoined, and the bridge corporation files its claim in admiralty in limitation proceedings, it cannot recover, unless it shows that it is possessed of a right of action at common law. The authorities cited tend to show that the nature of the action is not changed by its transfer to the admiralty court. It follows that the bridge corporation can have no recovery in this case, unless its rights are in some way affected by the act of Congress which regulates limited liability proceedings.

The Chief Justice has recently discussed the history and proper construction of the act in Hartford Accident Co. v. Southern Pacific Co., 273 U. S. 207, 47 S. Ct. 357, 71 L. Ed. 612, in which it was decided that the proceeding does not necessarily terminate even if it is determined that the shipowner is not entitled to limit his liability, but the admiralty court may proceed to adjudicate all claims coming from the accident whether independently cognizable in admiralty or not. Speaking of prior decisions of the court, the Chief Justice said:

"These decisions establish, first, that the great object of the statute was to encourage shipbuilding and to induce the investment of money in this branch of industry, by limiting the venture of those who build the ship to the loss of the ship itself or her freight then pending, in cases of damage or wrong, happening without the privity or knowledge of the ship owner, and by the fault or neglect of the master or other persons on board; that the origin of this proceeding for limitation of liability is to be found in the general maritime law, differing from the English maritime law; and that such a proceeding is entirely within the constitutional grant of power to Congress to establish courts of admiralty and maritime jurisdiction. * * * That all others having similar claims against the vessel and the owner may be brought into concourse in the proceeding, by monition, and enjoined from suing the owner and vessel on such claims in any other court; that the proceeding is equitable in its nature and

is to be likened to a bill to enjoin multiplicity of suits. Providence S. S. Co. v. Hill Mfg. Co., 109 U. S. 578 [3 S. Ct. 379, 617, 27 L. Ed. 103]. * * * The cases show * * * that the fund is to be distributed to all established claims to share in the fund to which admiralty does not deny existence, whether they be liens in admiralty or not. The Hamilton, 207 U. S. 398, 406 [28 S. Ct. 133, 52 L. Ed. 264]. * * *

"It is quite evident from these cases that this court has by its rules and decisions given the statute a very broad and equitable construction for the purpose of carrying out its purpose and for facilitating a settlement of the whole controversy over such losses as are comprehended within it, and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding. It is the administration of equity in an admiralty court. Dowdell v. U. S. District Court [C. C. A.] 139 F. 444, 445. The proceeding partakes in a way of the features of a bill to enjoin a multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. It looks to a complete and just disposition of a many cornered controversy, and is applicable to proceedings in rem against the ship as well as to proceedings in personam against the owner, the limitation extending to the owner's property as well as to his person. The City of Norwich, 118 U. S. 468, 503 [6 S. Ct. 1150, 30 L. Ed. 134]. * * *

"If Congress has constitutional power to gather into the admiralty court all claimants against the vessel and its owner, whether their claims are strictly in admiralty or not, as this court has clearly held, it necessarily follows as incidental to that power that it may furnish a complete remedy for the satisfaction of those claims by distribution of the res and by judgments in personam for deficiencies against the owner, if not released by virtue of the statute. * * *

"Of course, this equitable rule enlarging the chancellor's jurisdiction, in order to completely dispose of the cause before him, does not usually apply in an admiralty suit. Grant v. Poillon, 20 How. 162 [15 L. Ed. 871]; Turner v. Beacham, Taney, 583, Fed. Cas. No. 14,252; The Pennsylvania [C. C. A.] 154 F. 9; The Ada [C. C. A.] 250 F. 194; but this limitation of liability proceeding differs from the ordinary admiralty suit, in that, by reason of the statute and rules, the court of admiralty has power (Providence S. S. Co. v. Hill Mfg. Co., 109 U. S. 578 [3 S. Ct. 379, 617, 27 L. Ed. 1038]), to do what is exceptional in a court of admiralty—to grant an injunction, and by such injunction bring litigants, who do not have claims which are strictly admiralty claims, into the admiralty court. Benedict on Admiralty (5th Ed.) § 70, note 97. There necessarily inheres, therefore, in the character of the limitation of liability proceeding, in reference to such non-admiralty claims, the jurisdiction to fulfill the obligation to do equitable justice to such claimants by furnishing them a complete remedy."

The towing company, not unreasonably, contends that, since the great object of the act was to curtail the losses of shipowners, it would violate its spirit to remove one of the limitations imposed by the common law upon the right of the bridge owner to recover and thereby increase, rather than diminish, the damages. Since the admiralty court, having obtained jurisdiction, proceeds to dispose of the controversy in analogy to the procedure of a court of equity in dealing with questions of law, it is argued that it should follow the course outlined in equity rule 23, which provides that if, in a suit in equity, a matter originally determinable at law arises, it must be determined in that suit according to the principles applicable at law. Undoubtedly it is necessary in an ordinary case for the claimant, possessed of a right founded upon common law, to show that all of the essential elements prescribed by that law are present. On the other hand, it cannot be supposed that Congress intended to bring about an injustice to any claimant, compelled to litigate his claim in the admiralty court. Injustice will result in cases of mutual fault, unless the parties to the transaction are placed upon an even footing. This cannot be done in a collision case, if one of the parties is denied recovery because of his contributory fault, while the only penalty imposed upon the other party for his negligence is a diminishing of the amount he may recover.

The admiralty courts have sought to meet this situation in cases of collision between a bridge or pier and a ship, where there is no attempt to limit the vessel's liability. In such a collision, a cross-libel in admiralty by the stationary structure will not lie, but the owner must recover damages, if at all, in an action at law. Cleveland, Terminal & V. R. Co. v. Steamship Co., 208 U. S. 316, 28 S. Ct. 414, 52 L. Ed. 508, 13 Ann. Cas. 1215. But if, as in Northern Pacific Ry. Co. v. Duluth S. S. Co. (C. C. A.) 252 F. 544, a libel is filed by a steamship company against a railroad company for damages to a steamer received in a collision with a drawbridge, and the steamer was guilty of contributory negligence, the railroad company is entitled to recoup its

damages against the steamship company up to the amount of the latter, and, if its damages were the greater, to a decree of dismissal of the suit on its merits. No one can question the propriety of this procedure, but it is hardly adequate to meet the situation which arises when, under the liberal construction given to the statute in Richardson v. Harmon, 222 U. S. 98, 32 S. Ct. 27, 56 L. Ed. 110, the bridge owner is forbidden to pursue his remedy at law, and compelled to file his claim in admiralty. Then he is compelled to share with all other claimants in the fund limited by the value of the vessel, distributed in a proceeding which looks to "a complete and just disposition of a many cornered controversy."

When it is borne in mind that the court, in such a collision case, is considering the cross-claims of the parties involved, it shocks one's sense of justice to conclude that, if the damages of the ship exceed the damages suffered by the bridge, the ship may recover one-half of the difference between the damages on the respective sides, but, if the damages of the bridge exceed those of the ship, the bridge may have no recovery whatsoever. It could not have been the intention of Congress that such an anomalous situation should arise. Since Congress has the constitutional power to gather into the admiralty court all the claimants against the vessel and its owner, whether their claims are strictly in admiralty or not, and to limit their recovery to the value of the ship and the pending freight, there is no doubt of its power to apply the same rule of recovery to a claimant as to the ship, in cross-claims between them. Such a conclusion is in accord with the dictates of justice, and, if the statute be interpreted in the liberal spirit which pervades the decisions of the Supreme Court, it is fair to presume that Congress intended it. The bridge corporation in this case is entitled to recover under the admiralty rule.

A decree in accordance with this opinion will be signed.