### In re PENNSYLVANIA R. CO.
#### No. 131.

Circuit Court of Appeals, Second Circuit.
April 6, 1931.

Chauncey I. Clark, of New York City, for appellant.

George V. A. McCloskey and Willi^m F. Purdy, both of New York City, for ap₁ llees Cleary Bros., Inc., and others.

William F. Purdy and John E. Purdy, both of New York City, for appellee Hughes.

Warner Pyne, of New York City, for appellees City of Long Beach and others.

Macklin, Brown, Lenahan & Speer, of New York City (George V. A. McCloskey, of New York City, of counsel), for claimants.

Single & Single, of New York City, for claimant Armstrong Transportation Co.

Leo J. Curren, of New York City, for claimant James McWilliams Blue Line, Inc.

Park, Mattison & Lynch, of New York City, for claimants Mark W. Maclay and Charles E. McWilliams.

Foley & Martin, of New York City, for claimant Red Star Towing & Transportation Co.

John R. McMullen, of New York City, for claimant Cleary Bros., Inc.

Otto & Lyon, of New York City, for claimant Harold L. Valentine, Inc.

Before L. HAND, CHASE, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

The Pennsylvania Railroad Company maintains a terminal for the transportation of coal to the City of New York at South

Amboy, New Jersey, at the mouth of the Raritan River opposite the southern end of Staten Island. The tracks end in coal chutes upon the piers, whence the coal falls into barges which are brought beneath to be filled. Thereupon they are towed away, made up into flotillas and hauled through the Kills to the Upper Bay, and so to the city. While awaiting their turn at the chutes, they are moored in large numbers at a mooring rack some twelve hundred feet long, not far from the piers. The road does not try to keep the barges in any order at the rack; they are laid helter-skelter as they chance to arrive, or as it may be convenient to dispose them. Nor does it keep any plan of their arrangement in the coal office upon the pier; the employees, although they have a record of such boats as have been left, do not know where amongst the lot any particular one may have been put.

When a parcel of coal consigned to a given dealer is ready to be dumped, the barge which he has sent to lift it, must therefore be drilled out of the mass of barges moored indiscriminately at the rack and brought to the chutes. This may involve no more than taking her from the outside tier, or it may require the casting off of twenty or thirty outside barges, until she can be reached. This is the work of one or more tugs kept for that purpose in the vicinity; on the day in question, a Sunday in October, the "Brinton" was the only tug so employed. The practice is to tell the tug to fetch the consignee's barge, when the time comes to unload the cars which hold his coal; the tug goes to the rack, breaks out the barge and brings it to the chute.

On the afternoon in question there was a northwesterly gale, blowing off-shore, which swept the length of the rack, along which over fifty barges were moored, six or seven tiers deep. The "Brinton," which had already drilled out several barges for the chutes without mishap, got orders from the coal department to break out a barge, called the "Blue Coat," several tiers inside, whose owner's coal was then ready to be loaded. She went to the clustered barges, cast off the side lines of those outside, and was in train of laying a line to the "Blue Coat," when the hawsers parted of some twenty-two or twenty-three, so pushed away to give her access. She tried unsuccessfully to manage the flotilla thus afloat, but it at once passed out of her control, and drifted easterly in the Lower Bay at the mercy of wind and sea. The boats held together for a while, but eventually broke apart, some going aground at Great

Beds Light for a while, and later drifting out into the wider reaches of the Bay; the rest separating in various directions.

It is unnecessary, and indeed impossible, to follow the fate of each barge. Some were recovered while afloat; a few let go their anchors, though only one held, and then only because it fouled a cable. The greater part drifted clear across the Bay past Coney Island, and by Monday morning were off the westerly end of Long Beach. Even there they did not stop, but went ashore, or drifted near land, at Short Beach, Jones Beach, and even as far as Fire Island. Many were a total loss, for which their owners are claiming here. One eventually went to pieces against the Boardwalk at Long Beach in a southerly storm on Wednesday, doing great damage to that structure. The City of Long Beach and Long Beach-on-the-Ocean, Inc., are claimants for that damage.

The "Brinton" stood by on Sunday night, but on Monday morning, believing that she could do no more, cut her hawser, took the crews off the barges and put back, being out of fuel and food. The road's marine officials at Jersey City had meanwhile learned of the disaster, and on Sunday evening sent to the rescue two tugs, the "Number 32" and the "Overbrook," more powerful than the "Brinton." The "Overbrook" took the ground in her efforts, and perhaps the "Number 32" as well, though that is in dispute. They plied about in the darkness, picking up what they could, but not very effectively, since the conditions forbade much service. On Monday morning at about nine the road chartered the wrecking tug, "Resolute," and visited the shore where those barges still lay which had not been recovered. They were scattered along the beaches among the breakers, and it appeared to those on board impossible to reach them. Meanwhile a Coast Guard vessel had got hold of one, and a fishing vessel had picked up another. These the "Resolute" took in tow and brought back safely, at about four o'clock on Tuesday morning.

By Monday morning the storm had somewhat subsided, and it was relatively calm all of Tuesday and on Wednesday morning until shortly before noon, when the wind, which had meantime hauled to the south, again rose to thirty-four miles and blew on shore. Although the evidence does not certainly prove so, it was probably at this time that a single barge, the Hill, did substantially all the damage to the walk. On Tuesday, and probably also on Monday, though it is not necessary so to find, officials of the City of Long Beach

advised the road that two barges then near shore were likely to damage the walk, and the road's officials tried again to charter the "Resolute," but without success, she being then engaged elsewhere. Finding that the wreckers had no other craft available, they did nothing more. Small craft, fishing boats and launches, busied themselves on Monday and Tuesday with the rescue, in several cases successfully; but the road made no effort to secure the services of these vessels. On Sunday night, the tug, Hughes, set out from South Amboy and brought back five barges; for this she asks and has secured a salvage award.

Several of the barge owners sued the road and as more suits were in prospect, it commenced this limitation proceeding, surrendering the "Brinton," which it now concedes to be guilty, and asking exoneration in personam under the statute. The claimants appeared in number and contested the limitation, alleging that the road was in privity with the tug's fault. The facts as to this were as follows: One, Crane, was the "terminal shipping agent" of the road at South Amboy, and was in general charge of discharging coal cars and loading barges. He had had no marine experience, and knew nothing of the handling of barges and tugs, except so far as his position might acquaint him as the work went on. He told the tug masters when he was ready for a barge, specifying that which he would next want. Both he and the master of the "Brinton" swore that his orders left it to the discretion of the tug master, how to drill out a barge, and whether the weather conditions at the time justified compliance. Crane did not know—nobody in the coal department or probably anywhere else knew—where in the cluster any given barge was; it was left to the tug master to decide whether it was safe to carry out the order. Those in charge of the marine service of the road were at Jersey City, some miles away; at the scene of the misadventure there was nobody in charge but Crane.

The District Judge held the "Brinton" at fault for trying to take out the "Blue Coat." He charged the road with all the resulting damage to the barges and the Boardwalk, and refused to allow limitation; holding that Crane was a superintendent in privity with the road, whose order to the "Brinton" to fetch the "Blue Coat" was peremptory, and was made with knowledge of the dangers involved. Thus it became unnecessary to consider whether there was any succeeding duty, after the marine superintendent at Jersey City learned of the disaster, to exercise any

care to save the barges, or protect the walk. The road appealed; so did the tug, Hughes, for insufficiency of her salvage awards.

■ We are entirely satisfied, so far as concerns the fault of the "Brinton," that the limitation should have been allowed, and if the case ended there, it would in our judgment present little difficulty. Crane was not placed in charge of the drilling of the barges, and could not be supposed to know anything about marine matters. We need not dwell upon the evidence in detail; it is perfectly apparent that he was wholly unfitted for any such duties, and it would be altogether unreasonable to suppose that he should intervene or direct the conduct of the tugs. He was a landsman whose undisputed testimony that he was intended to act only as such, is corroborated beyond dispute by the organization of the business at the terminal. We cannot conceive that his order to drill out a barge should have been understood by the tug master as peremptory, or to supersede his own judgment. The "Brinton" was fit for the work, had already conducted it successfully, and the only fault was that of her master, who should not have undertaken to penetrate so far among the barges without help.

This fault being conceded, the tug is forfeit, but the road was entitled to limitation for any consequences "proximate" upon the original act. All the resulting damage seems to us such; it was not unlikely that such a number of barges, breaking loose in a gale, might spread upon the waters and drift at random. They might go ashore anywhere, and were likely to damage whatever they struck, the Boardwalk, or any other structure near the water. But, unless the subsequent notice to the marine superintendent, imposed an independent and affirmative duty upon the road, it is impossible to see any defence to the petition.

■ As to the barges themselves there was, however, such a duty. The road was a bailee. McWilliams Bros. v. Director General, 271 F. 931 (C. C. A. 2); Doherty v. Pa. R. Co., 269 F. 959 (C. C. A. 2); The Wyomissing, 45 F.(2d) 160 (C. C. A. 2); Stevens v. The White City, 48 F.(2d) 557 (C. C. A. 2). The relation is analogous to that of a tug which temporarily moors a barge on route, or at the end of the voyage. Bouchard Transp. Co. v. Pa. R. Co., 6 F.(2d) 362 (C. C. A. 2); McWilliams v. Davis, 285 F. 312 (C. C. A. 2); The Howard, 252 F. 85, (C. C. A. 2). Though it does not appear that the road towed all the barges from New York

to South Amboy, that in our judgment made no difference. The rack was the place fixed by the road for the delivery of barges to be loaded and then put into its tows. Nobody could expect an owner's tug to stand by until at the road's convenience it should take a barge out to be laden. Nor is it reasonable to suppose that nobody should meanwhile be responsible for its care, being itself helpless. We hold that the road received the boats as bailee and became responsible for a bailee's care until they were delivered.

■ If so, that duty remained as long as the bailment; it was not discharged as soon as the barges broke adrift. Hence when the marine superintendent at Jersey City learned of the plight of the flotilla on the afternoon of Sunday—he being a person in "privity" with the road under the limitation statute—any subsequent neglect must be charged to the road without limitation, and the question becomes one of fact; whether the road did all that a bailee should. We see no reason to complain of its action on Sunday night. The "Brinton" stood by; the "Number 32" and the "Overbrook" were sent to the rescue. So far as we can see, they did all that they could. The next morning the "Resolute" was chartered and went to the beaches; but Newman, the only witness called, swore that it was impossible to reach the barges, which were too far inshore. The "Resolute" stood by until Monday afternoon and then gave up, thinking that it could do no more. It is exceedingly improbable, having come for that purpose, and being by profession a wrecker, that she would have made no effort, if help was possible. On Tuesday the road, warned by the City of Long Beach, again asked for the "Resolute," or some other craft of the wrecking company, but was unable to get any; there is no reason to impugn its good faith. It appears to us that so far as large craft is concerned, nothing more was to be expected. To be sure, the road might have sent its own tugs again, and its efforts on Tuesday indicate that it then thought that more might be done, but it is entirely speculative to suppose that had another vessel once more gone to the beaches, she would have been of any more service than the "Resolute" on Monday. The claimants have the burden of showing fault, and loss arising from it (The 84–H, 296 F. 427, 432 [C. C. A. 2]); so far as this sort of effort would have helped, it seems to us that they have failed.

There remains the question whether the road should have used other means. It appears that when Newman was at the beaches in the "Resolute" on Monday, he saw some launches or fishing boats engaged in recovering some of the barges. In this they were partly successful, but, except as to the Hill, there is no evidence that any of those not rescued were in a position where they could be. It would in any case be necessary for a given owner to show that reasonable efforts would have salved his barge; it would not be enough to show that some unidentified barges might have been saved; perhaps they were. We cannot say, the burden being as it is, that any owner lost his property because of the road's inaction.

■ This does not however apply to the Hill. One, Kuehnle, was a civil engineer, attached to the City of Long Beach, who swore that on Monday he went to the beach and saw near the shore the Hill and another boat, one of which had already done some damage to the Boardwalk. He telephoned to the offices of the road at Jersey City, and to Hill, who said that he had no further interest in the barge, which he abandoned to his underwriters. It does not very definitely appear who got the message at Jersey City, but on Tuesday morning at any rate, Newman got a second message, and this was the occasion for his trying to recharter the "Resolute." He did nothing further; nor did any one else until after the damage had been done. However, Kuehnle went down a second time on Tuesday afternoon, and saw the two barges still afloat in about the same place. While he was there, a launch came in, picked up one of the two and carried it off without mishap.

■ Though the road cannot therefore limit its liability as to the Hill, it does not follow that the same is true as to the City and the Long Beach Company. It had no contractual relation with these, and was liable, if at all, only as a tort-feasor. So much damage as was done to the Boardwalk on Monday should be limited in any event; the road had had no adequate chance to act by small boats. But this was trifling and the real question is as to the rest. What we have to decide is whether the road's knowledge acquired after the "Brinton's" fault occurred, charged it with so much of the damage as ensued thereafter, and as it could have prevented by reasonable efforts. We may assume that in general the extent of a man's liability is to be measured by what he knew when he acted, except for the possibilities suggested in sections 195 and 196 of the Restatement of Torts (Tentative Draft No. 4); that is to say, save in unusual circumstances he does not become liable for

564

injuries which he may later find his act will cause, if at the outset these were too unforeseeable to charge him.

That is not this case. As we have said, the damage to the Boardwalk was fairly to be apprehended once the boats were set adrift; the road was charged with them, but the statute gave it a partial immunity. Should that immunity continue after knowledge is brought home? In form, at least, the section does not so read; it limits the "liability * * * for any * * * loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner" (section 183, title 46, U. S. Code [46 USCA § 183]). "Done" must refer to "loss" or "damage," though "occasioned or incurred" is as apposite to "liability." Congress appears to have had in mind the incidence of the fault, rather than its origin.

Such an interpretation does indeed imply that a person, who has set in motion a train of events likely to end in injury, remains under a duty to check them while he can; but this we think accords with good sense and ordinary notions of justice. It is true that the decisions do not cover the point, for the occasion to distinguish does not ordinarily arise. If his original liability ipso facto extends to all that is to be foreseen at the start, it would add nothing to put the tort-feasor under a continuing duty to check the culmination of his wrong. That can only become important when, as here, his liability changes meanwhile. Yet it is the injury that constitutes the wrong (Baltimore S. S. Co. v. Phillips, 274 U. S. 316, 47 S. Ct. 600, 71 L. Ed. 1069), and while the extent of liability is measured as of the time of the initial lapse, if the evil is still preventable, it would be a perverse doctrine to charge the actor with no duty to intervene while he can. Faced with the choice, as res integra, we do not hesitate to impute such a duty. Therefore, we hold that as to the damage done on Wednesday the road cannot limit its liability.

That liability is justiciable in this proceeding, though the tort was not maritime, and the limitation be denied. Hartford Acc. & I. Co. v. So. Pac. Co., 273 U. S. 207, 217, 218, 220, 47 S. Ct. 357, 71 L. Ed. 612; Richardson v. Harmon, 222 U. S. 96, 32 S. Ct. 27, 56 L. Ed. 110. There remains therefore only the question as to whether the Hill, the City and the company by their inaction after notice, disqualified themselves, and to what extent. Hill we cannot charge. The only evidence is that when on Monday afternoon

Kuehnle called him up, he said that he had no further interest in the barge, and relied upon his underwriters. This is not enough, regardless of whatever be the duty to protect one's property put in jeopardy by another; for such a duty cannot arise until it is apparent that the tort-feasor is not himself going to do what the law demands. The evidence does not show what Kuehnle told Hill, or that he had reason at that time to assume that the road would not do all it could to rescue the barge. Not till then was he required to act. This is a defence and the road must prove it; we find the record too equivocal to support the conclusion.

The fact is otherwise as to the City and the Long Beach Company. They were well advised of the danger to the Boardwalk on Monday, and telephoned the road on that day. The road took no action, and they called up again on Tuesday morning. Again, nothing was done. They waited during the whole of that day and on Wednesday morning, until the southerly storm rose about noon. During all this time they had as much opportunity to get a launch as the road; and they must have understood that if they did not act, no one would. Therefore, if they were under any duty to protect their property, and if their failure affected their rights, the facts put them in default.

It may seem a harsh rule that a man shall not recover for an admitted wrong, if he does not put himself to expense and trouble to fend against the threatened damage; yet when the inconvenience is trivial, this is the basis of those numberless cases which bar recovery when the sufferer has failed to protect himself after notice of danger. In the end the line must be found in the extent of the burden so imposed. If it be a question merely of turning one way or the other, he may not obstinately persist, and charge another for his injury. Grave dangers require easy precautions, even by those wronged. We have often applied that doctrine to tug and tow. The M. E. Luckenbach (D. C.) 200 F. 630, affirmed (C. C. A.) 214 F. 571; The Britannia (C. C. A.) 252 F. 583; The Coleraine (D. C.) 179 F. 977, affirmed (C. C. A.) 185 F. 1006; American, etc., Co. v. N. Y. (C. C. A.) 33 F.(2d) 97. These decisions all concerned slight efforts which nobody disputes that it is the duty of the injured person to make. The question here is whether the City and the company were called upon to hire a launch and tow away the barge. There are a number of cases in which as much was required; they

concern such things as fires, changes in the adjacent land, fences and stream pollution. Stuckemann v. Pittsburgh, 255 Pa. 307, 99 A. 906; Van Pelt v. Davenport, 42 Iowa, 308, 20 Am. Rep. 622; Shinn v. Smith, 80 Ark. 321, 97 S. W. 52; City of Lexington v. Chenault, 151 Ky. 774, 152 S. W. 939, 44 L. R. A. (N. S.) 301; Adams v. Clover Hill Farms, 86 Or. 140, 167 P. 1015; Wisconsin, etc., Co. v. Scott, 167 Ark. 84, 267 S. W. 780; Pribonic v. Fulton, 178 Wis. 393, 190 N. W. 190, 27 A. L. R. 281; Brown v. Brooks, 85 Wis. 290, 55 N. W. 395, 21 L. R. A. 255; Simpson v. Keokuk, 34 Iowa, 568; Illinois Central R. Co. v. McKay, 69 Miss. 139, 12 So. 447; Walrath v. Redfield, 11 Barb. (N. Y.) 368. At times a difference has been thought to exist if the tort was a trespass or a nuisance (Athens Mfg. Co. v. Rucker, 80 Ga. 291, 4 S. E. 885; Grant v. St. Louis, I. M. & S. R. Co., 149 Mo. App. 306, 130 S. W. 80); but if the exception be sound, it does not apply here. Heaney v. Heeney, 2 Denio (N. Y.) 625, holds the contrary in a case similar to that at bar, but the decision was explained in Walrath v. Redfield, supra, on the ground that the tort had been deliberate, though the court had given no such reason. City of Richmond v. Cheatwood, 130 Va. 76, 107 S. E. 830, is also to the contrary, though again it is not perfectly clear that it might not have rested upon the fact that the plaintiff thought, or might have thought, that the defendant would remedy the wrong before it caused the second damage which was at issue. The case at bar seems to us to fall within the principle of the bulk of these decisions, and the failure of the claimants to remove the barge on Tuesday and Wednesday to associate them equally with the road in resulting damage; they contributed to the injury.

A more perplexing question arises as to the effect of this neglect. The injury was on land over which the admiralty had no jurisdiction. Yet the District Court got jurisdiction because of the limitation proceeding. And so, had the suit been an action at law, the plaintiff's contributory negligence would have been a complete defence; in the admiralty it results only in a division of damages. We have to decide which rule applies here. It is well settled that where the wrong occurs in one jurisdiction, and action is brought in another, the rule of contributory negligence of the first governs. Illinois Central R. Co. v. Ihlenberg (C. C. A. 6) 75 F. 873, 34 L. R. A. 393; Long v. Atlantic, etc., R. Co., 238 F. 919 (C. C. A. 4); Caine v. St. Louis, etc., R. Co., 209 Ala. 181, 95 So.

876, 32 A. L. R. 793; Louisville & N. R. Co. v. Whitlow's Adm'r, 43 S. W. 711, 19 Ky. Law Rep. 1931, 41 L. R. A. 614; East Tennessee, etc., R. Co. v. Lewis, 89 Tenn. 235, 14 S. W. 603; Fitzpatrick v. International Ry. Co., 252 N. Y. 137, 169 N. E. 112, 68 A. L. R. 801. The law of the place where the tort occurs also controls the extent of the recovery. Slater v. Mexican National R. Co., 194 U. S. 120, 24 S. Ct. 581, 48 L. Ed. 900; Northern Pac. R. Co. v. Babcock, 154 U. S. 190, 14 S. Ct. 978, 38 L. Ed. 958; The Eagle Point, 142 F. 453 (C. C. A. 3). The same is true of more truly procedural issues (Central Vermont R. Co. v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252), at least when a statute is concerned. Galef v. U. S. (D. C.) 25 F. (2d) 134, is not to the contrary; it turned upon the fact that both parties were Americans, though whether that be a good distinction we need not decide. The same rule applies to suits in the admiralty under death statutes of a state, drawn after Lord Campbell's Act. The City of Norwalk (D. C.) 55 F. 98, affirmed (C. C. A.) 61 F. 364; Robinson v. Detroit, etc., Co., 73 F. 883 (C. C. A. 6); Quinette v. Bisso (C. C. A. 5) 136 F. 825, 5 L. R. A. (N. S.) 303; O'Brien v. Luckenbach S. S. Co., 293 F. 170 (C. C. A. 2); Truelson v. Whitney, etc., Co., 10 F.(2d) 412 (C. C. A. 5). The statute is considered as imposing the limitation as a condition upon the right.

However, it was held in Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218, that when action is brought at law in a State court for a collision upon navigable waters the plaintiff loses, if himself negligent. This has been often followed. Johnson v. U. S. Shipping Board Emergency Fleet Corp., 24 F.(2d) 963 (C. C. A. 2); Puget Sound Nav. Co. v. Nelson, 41 F.(2d) 356 (C. C. A. 9); Maleeny v. Standard Shipbuilding Corp., 237 N. Y. 250, 142 N. E. 602; Kalleck v. Deering, 161 Mass. 469, 37 N. E. 450, 42 Am. St. Rep. 421; Smith v. Norfolk & S. R. Co., 145 N. C. 98, 58 S. E. 799, 122 Am. St. Rep. 423. Dicta of our own in Roebling's Sons v. Erickson (C. C. A.) 261 F. 986, Storgard v. France & Canada S. S. Corp. (C. C. A.) 263 F. 545, and Port of New York Stevedoring Corp. v. Castagna, 280 F. 618 (C. C. A. 2) we overruled in Johnson v. U. S. Shipping Board Emergency Fleet Corp., supra. Conversely, it is well-settled that when the libellant sues in the admiralty upon a tort arising within the territorial waters of a State, his contributory negligence does not defeat him altogether; he need only divide his dam-

ages. Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619; The Max Morris, 137 U. S. 1, 11 S. Ct. 29, 34 L. Ed. 586. We can see no escape therefore from concluding that as between a common-law court and a court of admiralty the question is treated as one of procedure, though in general the law is otherwise. It must be the same in the case of a tort over which the admiralty gets jurisdiction only by virtue of the limitation statute. Until Southern Pac. Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900, it was usually understood that liabilities arising from acts taking place in territorial waters depended upon the law of the State. That case, together with Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171, and the cases which have since followed, have, however, established it that the maritime law alone creates them. Several of the decisions we have cited were after this change had come about, but they did not make a distinction. Nor indeed would it be material in any event. It was not suggested in The Max Morris that the liability there in suit was subject to divided damages because it was maritime, or that action would not be barred at law. Rather it was implied that the rule of the forum controlled. So too in Belden v. Chase it was assumed that the doctrine varied with the court. Nor can we see anything in Chelentis v. Luckenbach S. S. Co., looking otherwise. The cause of suit for cure and maintenance which the court was discussing is quite separate from that for indemnity; it does not depend at all upon the ship's fault, nor on the seaman's freedom from negligence. It is not a limitation upon a common-law, or maritime, liability, peculiar to a court of admiralty. So far as we can find there is nothing in the books beyond our own overruled dicta which throws doubt upon Belden v. Chase. And so we hold, though we acknowledge the anomaly, that in a case such as this the damages must be divided. Judge Soper reached the same result by a very different reasoning in U. S. v. Norfolk-Berkley Bridge Corp. (D. C.) 29 F.(2d) 115, 128–132, the only decision in point that we have found.

■ The wreck statute (33 USCA § 409) has no application and does not exonerate the road. We have indeed said [Red Star, etc., Co. v. Woodburn (C. C. A.) 18 F.(2d) 77], that it absolves the tug of injuries for which she might otherwise be liable; but certainly this does not occur until the opportunity for marking the wreck exists. Here the Hill was presumably half afloat, half aground, continuously pounding the walk till she went to pieces. It was impossible to treat her as a wreck and mark her; it would have served no purpose to do so. The statute is not directed to such a situation, and it would pervert its meaning so to read it.

On the other hand, we cannot see that the doctrine of Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770, and Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522, has anything to do with the case. Those decisions involved warranties of seaworthiness, and a warranty is an undertaking to pay the promisee if certain facts turn out to be otherwise than as the warrantor states. The warrantor is liable upon that promise without limitation, because his default—failure to pay—is personal. The Number 34, 25 F.(2d) 602, 607 (C. C. A. 2). A bailee on the other hand promises to use all reasonable efforts to return the vessel, but it is his agent who defaults, not he, if she be not properly guarded. The Ice King, 261 F. 897 (C. C. A. 2); The Soerstad (D. C.) 257 F. 130. Were he to promise at all hazards to return her, he might well be outside the protection of the statute.

We think that the salvage awards to the Hughes were too small. We raise the total of $450 to $1,350 to be divided in the same proportion and charged against the barges in rem. The Hughes was not at the time employed by, or working for, the petitioner.

The decree is reversed, and the cause remanded with directions to allow limitation as to all the barges except the Hill; to give full damages in personam for it and half damages for the damage done to the Boardwalk after Monday; and to award a lien of salvage in favor of the Hughes. The questions which may arise as to the marshalling of the proceeds of the "Brinton" among all the claimants have not been argued and we reserve them. In any case, they more properly arise upon final decree.