THE M. M. O'BRIEN.

THE PRR NO. 33.

DAVID E. WILLIAMS & CO. v. SARGENT BARGE LINE, Inc.

SARGENT BARGE LINE, Inc., v. PENNSYLVANIA R. CO.

Nos. 12484, 12618.

District Court, E. D. New York.

May 13, 1932.

Bigham, Englar, Jones & Houston (by R. F. Shaw) of New York City, for David E. Williams & Co.

Thomas A. McDonald, of New York City, for Sargent Barge Line, Inc.

Burlingham, Veeder, Fearey, Clark & Hupper (by C. I. Clark) of New York City, for Pennsylvania R. Co.

CAMPBELL, District Judge.

The two above entitled actions were by stipulation tried together, and as they both arise out of the same happening, one opinion will suffice.

In the first above-entitled action, Pennsylvania Railroad Company and steamtug PRR No. 33 were, on the petition of Sargent Barge Line, Inc., respondent and claimant of the barge M. M. O'Brien, impleaded under the Fifty-Sixth Rule in Admiralty (28 USCA § 723).

The first above-entitled action is brought by the owner of the cargo laden on the barge M. M. O'Brien, to recover for the alleged damage to a portion, and the loss of the balance of said cargo.

The second above-entitled action is brought by the owner of the barge M. M. O'Brien, and as bailee of the cargo, to recover for the alleged damage to the barge and cargo.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial, the said David E. Williams & Co. was a corporation, duly organized and existing under and by virtue of the laws of the commonwealth of Pennsylvania, with an office and place of business at 1416 Chestnut street, Philadelphia, Pa., and the owner of the cargo of 731 long tons of bituminous coal laden on the barge M. M. O'Brien, as hereinafter set forth.

The barge M. M. O'Brien was, during the pendency of process herein, within this district and within the jurisdiction of this court.

At all the times hereinafter mentioned and at the time of the trial, the said Sargent Barge Line, Inc., was a corporation, organized and existing under and by virtue of the laws of the state of Delaware, with an office and place of business located at No. 1 Broadway, borough of Manhattan, city, county, and state of New York, and the owner of the barge M. M. O'Brien, and bailee of the cargo on said barge.

At all the times hereinafter mentioned and at the time of the trial, the said Pennsylvania

Railroad Company was a railroad corporation, organized and existing under and by virtue of the laws of the state of Pennsylvania, with an office for the regular transaction of business in the city, county, and state of New York, and at all of said times the owner of the steamtug Akron, formerly the PRR No. 33.

The steamtug Akron, formerly the PRR No. 33, was, during the pendency of process herein, within the jurisdiction of the United States and of this court.

On the 31st day of December, 1930, the Pennsylvania Railroad Company received a verbal order to tow the O'Brien from New York to South Amboy, N. J., for coal.

On the 31st day of December, 1930, one of the steamtugs of the Pennsylvania Railroad Company towed the O'Brien to South Amboy, from Fifty-Eighth street, North River, arriving on the morning of January 1, 1931. The O'Brien lay there waiting for said David E. Williams & Co. to supply her with cargo, until the morning of January 5, 1931, when the O'Brien was shifted by the tug Akron, formerly PRR No. 33, of the Pennsylvania Railroad Company, from the light stakes to a dumper on Pier B, operated by the Seaboard Coal Dock Company; that it was subsequently loaded by said Seaboard Coal Dock Company with 731 tons of 2,240 pounds of bituminous coal, in good order and condition.

Said coal was the property of the said David E. Williams & Co., and was delivered to the Sargent Barge Line, Inc., to be transported by said Sargent Barge Line, Inc., on said barge O'Brien to digger No. 1, Fifty-Ninth street, North River, New York, there to be delivered in like good order to Interborough Rapid Transit Company, or assigns, in consideration of certain agreed freight, and in accordance with the valid terms and conditions of a certain bill of lading which was then and there signed by the master of the barge M. M. O'Brien, who was a duly authorized representative of said Sargent Barge Line, Inc., and delivered to the shipper.

About 12:25 o'clock p. m., on January 5, 1931, the barge M. M. O'Brien was shifted by the steamtug Akron, formerly PRR No. 33, and placed in the outer tier of loaded barges at the south side of Pier A, stern out, outside of two other barges; the barge Nebraska, lying bow out, being next to the pier, and the barge Three Sons, lying bow out, being outside of the Nebraska.

About 4:40 o'clock p. m. on said day, the barge Freedom was placed, stern out, alongside and outside of the O'Brien. There was a difference in the freeboard of the said boats. The Nebraska had a light load, her freeboard at the bow being about 6 feet. The Three Sons was the deepest loaded boat, and her freeboard was about 15 inches amidships. The O'Brien's freeboard was about 16 inches to 2½ feet amidships, 3 feet to 4 feet at the stern, and about 4 feet at the bow, to which should be added another foot, the height of the rail. The Freedom had about 4 feet to 6 feet at bow and stern.

There were two other tiers of loaded boats alongside the south side of Pier A, and there were five barges in the space north of Pier B, other than that required to be left open for working coal dumpers.

At the long mooring rack north of Pier A, there were a number of light barges. Pier B projects about 200 feet beyond Pier A, and off the end of Pier B, the coal barge J. J. Whitney lay light, with a canvas patch over a large hole in her planks about a foot above the water line, and outside of her lay a heavy Baxter wrecker.

At no time from 2 o'clock p. m. until 7:20 o'clock p. m. was the steamtug Akron, formerly the PRR No. 33, lying up the slip between Piers A and B, but at 7:20 p. m., the Akron, formerly the PRR No. 33, required water and proceeded to the water plug at the inner end of the slip, south side of Pier A, and commenced to fill her forward tank.

The master of the Akron then went to the Pennsylvania Railroad Company office at the inshore end of Pier A, and telephoned to the Jersey City office the diagram of the boats placed in the loaded tow for which orders to tow to various destinations in New York Harbor had been received.

While he was telephoning between 7:45 and 7:50 o'clock, the captain of the O'Brien, who had been directed to him at the office by the engineer of the Akron, told him that the O'Brien was leaking and requested him to shift her to the mud.

The tug master accompanied by the captain of the O'Brien at once walked down Pier A and boarded the O'Brien to see what assistance, if any, was required.

He found that the O'Brien had a list to port; that is, toward the Freedom. At that time the weather was not bad, and there was not sufficient sea to interfere with the usual shifting operations of the tug. The tug master then walked back on Pier A, finished tele-

phoning, and the captain of the barge O'Brien having returned to him for assistance, the master of the Akron, then the PRR No. 33, accompanied by the captain of the O'Brien, boarded the steamtug Akron, and proceeded to the assistance of the O'Brien.

The captain of the O'Brien went into the engine room of the Akron, where he remained until after the O'Brien sank.

The list of the O'Brien to port had increased in five or ten minutes so that her port rail was submerged.

The weather was still moderate and the deck hands of the Akron made the barge fast, and the Akron then swung the O'Brien and the Freedom around in the slip so that the Freedom came alongside of the Western, the outer boat in the second tier; the O'Brien still remaining alongside the Freedom.

The captain of the Freedom, during this maneuver, was taking off the breastlines to the O'Brien.

With her port side to the starboard side of the O'Brien, and made fast with three lines, and with the O'Brien listed to port and away from her, the Akron started ahead, and after proceeding about two hundred feet, and when she was about to swing to port to proceed around the end of Pier A, the O'Brien turned over and sank, on her port side, at about 8:15 o'clock p. m.

The Akron then returned to the water plug, and after finishing getting water, she proceeded out of the slip, and patrolled the entrance to the slip so as to warn all vessels of the sunken boat, until relieved at about 6 o'clock the next morning.

The observations of the Government Weather Bureau Station at Sandy Hook showed that the prevailing wind there, on the day in question, between 4 o'clock p. m. and 10 o'clock p. m., was easterly, with a velocity, between 4 and 5 o'clock p. m.; of 23 miles an hour; between 5 and 6, 28 miles an hour; between 6 and 7, 29 miles an hour; between 7 and 8, 30 miles an hour; between 8 and 9, 25 miles an hour; and between 9 and 10, of 23 miles an hour; with a maximum velocity of 34 miles east at 5:15 o'clock p. m., 34 miles east at 6:08 o'clock p. m., 33 miles southeast at 7:15 o'clock p. m., and of 37 miles east at 9:06 o'clock p. m.

The sea off Sandy Hook was smooth to moderate. Sandy Hook, an open and unsheltered water, is approximately 15 miles to the eastward of the piers in question, on Raritan Bay, and the waters of Raritan Bay are sheltered, and the wind and sea conditions prevailing at Sandy Hook would not be found at the piers in question.

Pier B extended some 200 feet beyond Pier A, and the J. J. Whitney and the Baxter wrecker were moored at the end of that pier, and the place where the O'Brien lay was almost completely sheltered in an east wind and sea, and entirely sheltered when the wind and sea are from the southeast.

There were no other requests for assistance for any other boat made on the day in question, and no boats, light or loaded, at the place in question, were in any trouble, notwithstanding the fact that the said J. J. Whitney had a temporary patch over a hole in her side.

No officer or director of the Sargent Barge Line, Inc., was on board at the time of the happening in question, and there is no evidence on which to base a finding of unseaworthiness.

On the facts as found, it does not seem to me that the steamtug Akron, formerly the PRR No. 33, or the Pennsylvania Railroad Company, can be held liable in either action.

I saw and heard the witness Sanger, captain of the O'Brien, and was not impressed by his testimony. His testimony is so clearly erroneous in many particulars that it is not of great weight.

He says the O'Brien was placed at Pier A, between 4 and 5:30 p. m. She was not; the time was 12:25 p. m. He says that soon thereafter it started to blow pretty hard, and about 6 p. m., he went up Pier A to where the No. 33 was tied up in the slip, and asked to be turned around; but the tug master would not give him an answer.

He is certainly wrong as to time, for the reason that the No. 33 did not come into the slip until 7:20 p. m.

I am convinced that he did not make frequent requests for assistance, to the master.

It seems to me to be impossible to harmonize his testimony that speaking of the O'Brien, he told the captain of the tug Akron, formerly PRR No. 33, "she looks as though she is going to sink," that the weather had been getting worse steadily, and long before the tug came out to help, waves and swells were coming over the barge's stern, breaking the cabin windows and high enough to hit the top of the cabin, and that water poured in and grounded his electric current, so that he could not use his gasoline pump if he had wished to, with his testimony that the boat was not leaking, and that he had no occasion to pump, and that both at the first time he

went to the tug about 6 o'clock, and later when the tug came out, the O'Brien had no list.

The captain of the O'Brien made no attempt to use either his gasoline pump or hand pump (or the gasoline pump by a hand lever) at any time.

He gave three different and improbable explanations of the tug's maneuvers in turning the O'Brien: First, that the tug, after letting the Freedom swing around in the slip to the next tier, got a line on the O'Brien's stern and "to get her bow out" pulled her around; second, that the tug "started shoving her out across, bow out," after having "swung around to get inside of her" "when the tug put a line on her stern"; third, that the tug "pulled the stern in," and so "turned the O'Brien around."

He also testified that in performing whatever maneuver the tug did perform, the barge was left broadside "pretty near across the slip," exposed to tremendous waves, which broke over her coamings, and that although she had not been leaking before and had the same freeboard as when tied up in the tier, the barge almost immediately rolled or listed over "in toward the dock," and sank on her port side.

He likewise described the wind as a west wind, hitting the starboard side of the cabin, and on cross-examination said he did not know on which side his boat went down.

The weather was fine when the O'Brien was placed outside of the Three Sons, and the berth was one used for the mooring of loaded coal boats, and neither the Nebraska, the Three Sons, nor the Freedom, suffered from wind or sea. There was no relationship of tug and tow between the PRR No. 33, now the Akron, and the O'Brien, on the evening in question.

█ No liability on the part of the Pennsylvania Railroad Company can be found, in any event, unless it was a bailee of the barge, and I doubt that it can be found even if it was a bailee.

It is strongly argued on behalf of the steamtug PRR No. 33 and the Pennsylvania Railroad Company that the railroad company was not a bailee, citing Stevens v. The White City, 52 S. Ct. 347. 76 L. Ed. 699, opinion of Mr. Justice Butler, March 14, 1932; but the facts in this case differ from those in the case last cited, and the Circuit Court of Appeals of this circuit has held, as to barges like the M. M. O'Brien, at the South Amboy Terminal of that railroad, the Pennsylvania Railroad Company is a bailee, and that is

binding on this court. McWilliams Bros. v. Director General of Railroads (C. C. A.) 271 F. 931; Doherty v. Pennsylvania R. Co. (C. C. A.) 269 F. 959; Brinton and Drifting Barges, 1931 A. M. C. 852 (C. C. A.) (In re Pennsylvania R. Co.) 48 F.(2d) 559.

The captain of the O'Brien is in error as to the repeated requests he testified he made to the master of the No. 33, as I have hereinbefore pointed out, as well as in his testimony with reference to the way in which the O'Brien was turned. If the condition of his boat was as dangerous as he suggests, there would have been no advantage in turning her bow out; in fact the cargo hatches at the stern had the protection of the cabin, which they could not have had at the bow, where the freeboard was only one foot higher than at the stern. I believe the engineer of the tug No. 33, who testified that the captain of the O'Brien told him that his boat was leaking, and that he wanted to be put on the mud.

The master of the No. 33 speedily responded to the call and used good judgment and reasonable skill and care in his efforts to place the O'Brien on the mud, but was not successful, as she sank at the entrance to the slip.

█ Even if with the knowledge that comes after the event we might feel inclined to criticize the maneuver (which we are not), we should put ourselves in the place of the tug master and divest ourselves of the knowledge that comes after the event. The Harold (D. C.) 287 F. 757; The Clarence L. Blakeslee (C. C. A.) 243 F. 365; The Mary T. Tracy (C. C. A.) 8 F.(2d) 591, 593.

On behalf of the M. M. O'Brien and Sargent Barge Line, Inc., is cited Doherty v. Pennsylvania R. Co., supra, which does not seem to be in point.

In the Doherty Case, negligence was proved on the part of the Pennsylvania Railroad Company in placing the barges in an improper place during a storm, and then failing to heed the protests of the barge captain, or render assistance when requested.

No such negligence was shown here, as the barge O'Brien was laid to the south of Pier A at 12:25 o'clock p. m. on January 5th, when the wind force at Sandy Hook was only 17 miles an hour, and the barge captain admitted that the weather was favorable, with no threat of storm, and the berth was a reasonably sheltered one.

There was a captain on the barge M. M. O'Brien at all the times herein mentioned.

■ The sinking of the barge O'Brien was due to the negligence of her captain, and not to any lack of care on the part of the Pennsylvania Railroad Company. She showed a heavy list to port, and the barge captain did no pumping. I reject his excuse, that there was no water in the barge, and that there was no reason to pump.

Of course, there was some wind and some sea, as was testified by the captains of the boats in the tier with the O'Brien; but I do not believe that the sea was high enough to come in, or that sufficient water came over the stern of the O'Brien and into her cargo of coal, protected as it was by the cabin, and with the Freedom outside of her and the Three Sons inside of her, to cause the list.

I am convinced that the sea was not high enough to come on the top of the cabin of the O'Brien.

This it seems to me is shown by the fact that neither the wind nor sea was high enough to interfere with the shifting of boats, that none of the other boats in the tier with the O'Brien were suffering in that way, although the freeboard of the Three Sons was lower than the freeboard of the O'Brien, that a boat with a canvas patch in her side was out on the end of the longer and more exposed Pier B and suffered no injury, and that no other boat even asked for assistance.

There is a conflict as to whether the Three Sons was lying bow or stern out, but I have accepted the testimony of her captain, and find that she was lying bow out.

Considering the testimony of the captain of the O'Brien as to her freeboard and height of coamings, and his many variations of the maneuvers of the tug in its movement of the barge, it is to me inconceivable that a sufficient quantity of water came over the coamings, while the barge was being shifted, to swamp the barge and cause her to roll over on her port side and sink.

■ The evidence is not sufficient to warrant a finding of unseaworthiness, and certainly not at the time she loaded her cargo.

The cause of the sinking of the barge M. M. O'Brien was either unexplained or due to the negligence of the captain of the barge.

I saw him and heard him testify, and I am convinced that the sinking was due to his negligence.

■ He should have shown some activity earlier and not waited, without any effort on his part, even of pumping, until his boat was in a sinking condition. New York & New Jersey Transp. Co. v. Cornell Steamboat Co. (C. C. A.) 180 F. 107.

No negligence on the part of the tug PRR No. 33 or the Pennsylvania Railroad Company has been shown.

I find as conclusions of law:

That the libelants have failed to show by a fair preponderance of evidence that the Pennsylvania Railroad Company, or the steamtug PRR No. 33, now the Akron, or any persons for whose actions they or either of them were responsible, in any manner were guilty of negligence, or negligently caused or contributed to the damages to the said coal barge M. M. O'Brien and her cargo, or either of them.

That neither David E. Williams & Co., libelant in the first above-entitled action, nor any one for whose actions it was responsible, in any way negligently contributed to the damages to the coal barge M. M. O'Brien, or the cargo thereon.

That the Sargent Barge Line, Inc., its agent, servant, or employee, the captain of the coal barge M. M. O'Brien, negligently failed to give proper care and management to the said coal barge M. M. O'Brien, and to the pumping of said coal barge, on the 5th day of January, 1931, and that by reason of their negligence both the coal barge M. M. O'Brien and the cargo thereon were damaged or destroyed, and that the said Sargent Barge Line, Inc., was wholly and solely at fault.

That the libelant in the first above-entitled action is entitled to a decree against Sargent Barge Line, Inc., for its damages, with interest and costs, and the usual order of reference; and the Pennsylvania Railroad Company and the steamtug PRR No. 33 are entitled to a dismissal of the petition and libel, with costs against Sargent Barge Line, Inc., the petitioner.

The respondent, Pennsylvania Railroad Company, and the steamtug PRR No. 33, now the Akron, in the second above-entitled action are entitled to a decree against the libelant Sargent Barge Line, Inc., dismissing the libel with costs.

The Sargent Barge Line, Inc., is entitled to limitation of its liability, but not to exoneration from liability.

That decrees may be entered in each of the above-entitled actions in accordance with this opinion.

Settle decrees on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules

in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of this court, as provided by the rules of this court.