**THE WICHITA FALLS.**

**In re SOUTHERN S. S. CO.**

No. 333.

District Court, S. D. Texas, Houston Division.

June 4, 1936.

Supplemental Opinion July 22, 1936.

Royston & Rayzor, of Houston, Tex., for petitioner.

Sewall Myer and Lewis Fisher, both of Houston, Tex., for respondents.

KENNERLY, District Judge.

Willie Black, Arthur Chappell, Bishop Coleman, O. P. Starkey, E. L. Gibson, Andrew Salter, Julius Taylor, L. W. Connacher, A. Duncan, and Henry Gibson (called respondents for convenience) were on, and prior to, March 15, 1935, and are now, asserting claims for personal injuries against the Southern Steamship Company (for convenience called petitioner), owner of the steamship Wichita Falls, and on that date, such owner filed this action, seeking to limit its liability under sections 181 to 195, c. 8, title 46 U.S.C.A.

The claim of respondents was and is that guards or other persons, armed with guns, etc., placed on such steamship by petitioner, fired on them and other persons congregated on the unloading docks used by petitioner at the Port of Houston, Tex., during a longshoreman strike on or about May 14, 1934, causing such injuries.

Some or all of respondents have brought common-law actions for damages for such claimed injuries against petitioner and others in the state court, the prosecution of which actions against petitioner has been suspended.

The facts fairly deducible from the evidence are as follows:

(a) Petitioner (Southern Steamship Company), prior to and on May 14, 1934, was, and has since been, engaged in operating some seven ships in the coastwise trade or shipping between the ports of Houston, Tex., Philadelphia, Pa., and Norfolk, Va., and was and is the owner of the steamship Wichita Falls, engaged in such coastwise trade or shipping, principally between the port of Houston and the port of Philadelphia.

(b) Petitioner, about 1920, for pay, acquired from the city of Houston, and/or the Port Commission of the city, the right to use certain municipal docks, particularly dock No. 4, located on the Houston Ship Channel, a short distance from the center

of Houston, but within its corporate limits, for the purpose of loading and unloading its steamships, and, under the right so acquired, continued up to and including May 14, 1934, and since, to load and unload its ships at such docks. Petitioner at all times paid to the city of Houston or the Port Commission compensation for the use of such docks at the prices and in accordance with the tariff promulgated by them.

(c) On and prior to May 14, 1934, there existed at the Port of Houston and elsewhere an organization known as the International Longshoremen Association (for brevity called the I. L. A.), composed of longshoremen employed in the loading and unloading at the Port of Houston, and elsewhere, of ships of persons and companies other than petitioner. Petitioner had and employed its own longshoremen to load and unload its ships; they being men who had been in its employ for many years, none of whom were members of or were affiliated with the I. L. A. Petitioner never at any time had employment contracts with the I. L. A. or its members, nor did petitioner have any negotiations with them, except one request from it that petitioner make a contract with it, which petitioner declined.

(d) On or about May 1, 1934, the members of the I. L. A. at the Port of Houston left the service of their employees, and went out on strike, and began picketing the docks of their employers. Although there was no controversy between the I. L. A. and petitioner, and no controversy between petitioner and its own longshoremen, the I. L. A., on or about that date, began picketing the docks used by petitioner as well. At that time, petitioner had a ship in port ready to be loaded on May 2, 1934. On May 2, 1934, all, or substantially all, of petitioner's employees came to work, ready and willing to load such ship, but were prevented by the pickets of the I. L. A., aided by a crowd of sympathizers who had congregated about the docks used by petitioner, and such ship, on May 3d, left the Port of Houston without cargo.

(e) The same or similar conditions prevailed on, up to, and after May 14, 1934. On May 8, 1934, someone in a congregated crowd of members of the I. L. A. and their sympathizers threw a club through the windshield of the automobile in which a representative of petitioner was riding near the docks used by petitioner. Although petitioner's representatives repeatedly requested it, petitioner was not given or afforded, during such period, protection against the I. L. A., its members, pickets, and sympathizers, by either the city, county, or state authorities, and matters at and around the docks used by petitioner were practically in the hands of and controlled by the I. L. A., its members, pickets, and sympathizers. A number of the employees of petitioner were assaulted and injured, and all were prevented from reaching the docks used by petitioner, and were prevented from loading and unloading petitioner's ships.

(f) During that period (May 1 to May 14, 1934), although petitioner had five ships available, it could not load or unload them. During such period, petitioner had on hand at its Houston docks between 21 and 22 million pounds of freight destined to points in Texas, Oklahoma, Arizona, and other states, which it could not, because of such interference of the I. L. A., its members, pickets, and sympathizers, forward to destination.

In fact, the evidence shows a virtual paralysis of petitioner's business during that period, and that it sustained heavy losses.

All the matters and things set forth in the foregoing paragraphs (c), (d), (e) and in this paragraph, and the succeeding paragraphs (g), (h), and (i) were, on and prior to May 14, 1936, well known to the petitioner, and to its officers who had active charge of its affairs, and to its Houston agents, and to the master and other officers of the steamship Wichita Falls.

(g) On May 14, 1934, such steamship, Wichita Falls, belonging to petitioner, was due to arrive at dock No. 4, Port of Houston, and petitioner desired and sought to arrange for its unloading. Not being able, because of conditions hereinbefore set forth, to have its own men or longshoremen unload it, petitioner, through its Houston agents, employed or caused to be employed in the city of Houston about 200 longshoremen belonging to the Lone Star Longshoremen Association to do so. (These for convenience are called "new men"). The new men so employed entered trucks furnished by petitioner for the purpose of riding through the streets of Houston to dock No. 4. In the trucks there were also a number of armed guards employed by petitioner and placed therein by petitioner to protect the new men from bodily injury. Apparently, learning of petitioner's purpose to bring the new men

to dock No. 4, a large number of persons, estimated at 500, including the I. L. A., its members, pickets, and sympathizers, congregated on and about the dock and in the streets, alleys, and on the property adjacent to the dock, many of whom were armed with firearms, clubs, and other similar weapons, for the purpose of using, and with the intent to use, force, and all the force necessary, to prevent the carrying of the new men in such trucks to the dock, and prevent them from unloading petitioner's ships. The trucks proceeded to a point about a block or more from the dock, and were there stopped by such armed persons. Thereupon, police officers of the city of Houston, several of whom were present, advised and directed petitioner not to undertake to carry the new men to the dock and unload them from the trucks, claiming that bloodshed would result, and that many persons would be killed and/or suffer serious bodily injuries.

(h) Thereupon, petitioner's trucks, with such new men or most of them, and such armed guards or most of them, withdrew from that vicinity and proceeded over the public highways down the Ship Channel, to a point at or near Deepwater (some 15 or 20 miles east of Houston), where the steamship Wichita Falls had anchored, and where such new men went aboard the steamship for the purpose of being transported on the steamship up the Ship Channel to the dock, in order that they could unload, and with the purpose of unloading, the steamship.

(i) Petitioner's armed guards accompanied the new men on board the steamship to use force, and all the force necessary, to protect the new men, the steamship, and its officers, crew, and cargo against violence, and to resist attacks, from the persons who had prevented them from reaching the dock during the morning and/or other similar persons, and to aid in docking and unloading the steamship, and in clearing the docks of persons congregated there, so that such steamship could be unloaded.

The new men and armed guards were so taken on board the Wichita Falls with the full knowledge and approval of petitioner, its officers in active charge of its affairs, its Houston agents, the master and other officers of the ship, and they knew of the conditions at the Port of Houston, and the purpose for which they were taken on board.

(j) A number of the persons who had congregated about the docks during the morning followed the trucks to Deepwater, learned that the new men and guards had gone aboard the steamship, and then returned to Houston, and spread the news, so that by the time the steamship reached a point about mid-stream in the Ship Channel near to and opposite dock No. 4, there were congregated on the dock, in the streets and alleys, and properties near the docks, a crowd of persons, including respondents, estimated by witnesses to number between 500 and 1,500.

(k) The evidence discloses that the persons so congregated there were of three classes, and for convenience of reference are divided in three groups:

Group one. Several hundred persons, some of whom were members of the I. L. A., and some of whom were sympathizers with the I. L. A., armed (as they, or some of them, had been in the morning when the trucks with the men on board endeavored to reach the dock) with firearms, clubs, and other similar instruments, whose purpose it was to use force, and all the force necessary, to prevent the landing of the steamship and the unloading of the cargo therefrom by the new men thereon. Their purpose was, if necessary, to kill or do serious bodily injury to the new men, the guards, the officers, and crew, and any other person who might be engaged in landing or unloading the ship or who might resist them, and to do injury to the ship and its cargo if that was necessary to prevent its landing and unloading.

Group two. Several hundred persons, some of whom were members of the I. L. A., were there to use persuasive methods short of violence to prevent the loading of the ship and the unloading of its cargo. They knew of the presence there of those in group one, and if they did not aid and abet them, they did nothing to prevent them from carrying out their purpose.

Group three. Several hundred persons who were there as spectators to see what happened, many and perhaps most of them being in sympathy with the I. L. A. and its members, but who took no part in their controversy other than to be present.

(1) As the ship began its movement to draw up to and land at the dock, some of the persons assembled on and about the dock began to yell at, curse, and threaten those on board the ship. Stones and other missiles were thrown at and struck the

ship. Persons in group one, or some of them, began to press towards the edge of the dock and make ready to board the ship when she touched the dock, with the purpose of doing whatever seemed to them necessary to prevent the landing and unloading of the ship, i. e., killing or doing serious bodily injury to the new men, guards, officers, and crew thereon, and injury to the ship and cargo. Thereupon, just before or about the time the ship landed, persons on board the ship fired a number of shots from firearms at persons in group one on and about the dock, striking respondents, or some of them, and wounding and injuring them. The firing distracted the attention of the persons on and around the dock, caused them to scatter, the ship landed, the guards cleared the docks, and the new men unloaded the ship.

(m) The evidence shows one police officer of the city of Houston was present at and before the firing began, but he was powerless to control the persons on the dock, or to prevent those of them there for that purpose, particularly those of group 1, from undertaking, in the manner stated, to prevent the landing and unloading of the ship. Soon after the firing began, some one telephoned for more Houston policemen. After about 20 minutes, they came, and aided the guards in clearing and keeping clear the docks, so that the unloading of the ship could proceed.

(n) If the shots had not been fired from the ship at the persons in group one, they would have boarded the ship when it touched the dock, and would have violently attacked and killed and/or injured the new men, guards, officers, and crew, and the new men, guards, officers, and crew would have resisted in like manner, resulting in much bloodshed. There was reasonable cause for those on board the ship to believe, and it is found that they did believe, when the shots were fired, that their lives and persons and the ship and its cargo were in danger and jeopardy. Petitioner's situation was that it must either proceed in the manner it did to land and unload the ship, or send it to some other port to be unloaded, or not unload it at all.

(o) Situated as they were, the persons on the ship who fired on those in group one on the dock could not distinguish one person from another in the crowd on the dock, nor could they tell which of such persons were there to do violence, and which were not. They did not intend to shoot, kill, or injure those who were there not to do violence. But with respect to those persons in group one who were there to do violence, they intended to use force, and all the force necessary, to bring about the landing of the ship and the unloading of the cargo thereon by the new men thereon. Their purpose was, if necessary, to kill or do serious bodily injury to the persons in group one who might, with force, resist the landing and unloading of the ship, or injure or attempt to injure the ship or cargo or the new men, guards, officers, or crew thereon.

(p) In presenting this case, petitioner would apparently have it appear that the new men and armed guards were taken on board the ship for a pleasure cruise on the Ship Channel, and were attacked by persons on the dock. Respondents would apparently have it appear that the crowd on the dock, including those in group one, were there to welcome the ship and its crew to Houston, and were fired on from the ship. Not so. There is no reason, or basis of fact, in such contentions. The persons in group one were there, as has been stated, to prevent by force, and to use all necessary force to prevent, the landing and unloading of the ship. The armed guards on the ship were there to, by force, and to use all necessary force to, land and unload the ship, and to prevent persons in group one from killing or doing bodily injury to the new men, guards, officers, and crew thereon, or doing injury to the ship and/or its cargo.

All the facts set forth herein were known to petitioner, to petitioner's Houston agents, to the officers and crew of the ship, and they all acted together and in concert in what was done. The action of petitioner's Houston agents, the armed guards, the officers and crew were with the knowledge and approval of petitioner, and not independently of petitioner.

(q) In shooting at persons in group one, the persons on board the ship shot the respondent L. W. Connacher. He was not a member of the I. L. A. He was not a longshoreman. He had no interest in and took no part in the controversy. He was clearly one of group three. He owned and operated a café near dock No. 4, and was in or near the crowd, taking kodak pictures. He was accompanied by a lady companion. He knew of the strike of the longshoremen, knew of the presence of the new men and guards on the ship, and knew

that while some of the crowd on the dock were there peaceably, others were there to do violence and intended to attack those on the ship, or if he did not know, he could have learned of it by the use of the slightest diligence. Clearly he knew, because his restaurant was close by where trouble had been going on for two weeks. That he knew he was in danger is shown by the fact that he left his lady companion so she would be safer when he went forward to the point where he was shot. No one on the ship knew why Connacher was at the place he was when he was shot, and since he was not engaged in the controversy, they did not intend to shoot him. He was shot accidentally, i. e., while those doing the shooting were shooting at those in group one. Petitioner was negligent in causing or permitting those on board the ship to shoot at those in group one while Connacher was at the place he was when he was shot. Connacher was negligent in being there. Connacher's injury was caused by the negligence of petitioner and Connacher himself.

(r) In shooting at persons in group one, the persons on board the ship shot the respondents, Willie Black, Arthur Chappell, Bishop Coleman, E. L. Gibson, Andrew Salter, Julius Taylor, A. Duncan, O. P. Starkey, and Henry Gibson. They were longshoremen, and some or all were members of the I. L. A. They were each and all interested in the controversy between the I. L. A. and its members and petitioner. They clearly all came within group two. There is no direct evidence that they were armed or would have done violence to prevent the landing and unloading of the ship. It is claimed for them that they desired to prevent its landing and unloading by peaceful methods, but they were in the crowd with those in group one, and while there is no evidence that they encouraged those in group one to violence, there is none that they tried to prevent it. They, of course, knew of the strike, knew of the events which had happened during the past two weeks, knew of the presence of the new men and armed guards on the ship, and knew that there were those in the crowd on the dock who were there to do violence and intended to attack those on the ship. They knew that there would almost certainly be an armed conflict between those in group one and the guards and new men on the ship. They knew that they were in danger in being where they were.

No one on the ship knew that they were at the place they were when they were shot, and since they were not actively engaged as members of group one, those on the ship did not intend to shoot them. They were shot accidentally, i. e., while those shooting were shooting at others. Petitioner was negligent in causing or permitting those on board the ship to shoot at those in group one while respondents, Black, Chappell, Colemen, Gibson, Salter, Taylor, Duncan, Starkey, and Gibson, were where they were when they were shot. Such respondents were each negligent in being there. Such respondents' injuries were caused by the negligence of petitioner and by their own negligence.

█ 1. The ship Wichita Falls was of the type, and its operations of the character, to entitle petitioner, its owner, to file this petition for limitation of liability, and this court has jurisdiction thereof. Section 188, title 46 U.S.C.A. The character of liability which respondents charge against petitioner is within the act of Congress (sections 181 to 195, c. 8, title 46 U.S.C.A.) relating to limitation of liability. Richardson v. Harmon, 222 U.S. 96, 104, 32 S.Ct. 27, 56 L.Ed. 110; Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 218, 47 S.Ct. 357, 71 L. Ed. 612.

█ 2. Under the facts found, petitioner is not entitled to limit its liability under such act. As found herein, the firing on the persons in group one by the persons on board the ship was not without the privity or knowledge of petitioner, but with petitioner's full knowledge. Section 183, title 46 U.S.C.A.

3. Though petitioner is found not entitled to limit its liability, the court must nevertheless proceed to ascertain whether there be liability, and, if so, the amount thereof. Hartford Accident & Indemnity Co. v. Southern Pacific Co., supra.

█ 4. It is not necessary to discuss the question of the respective rights of petitioner and of the persons in group one who were fired upon by persons on the ship. Neither of the respondents are shown to be members of group one. The finding being that respondents' injuries were caused by the negligence of both petitioner and respondents, i. e., the negligence of petitioner and the contributory negligence of respondents, the question is presented of whether respondents may recover damages

from petitioner at all, or whether the damages are to be divided between them. See U. S. v. Norfolk-Berkley Bridge Company, 29 F.(2d) 115; In Re Pennsylvania Ry. Co. (C.C.A.) 48 F.(2d) 559, 564; petition for certiorari denied Pennsylvania R. Co. v. James McWilliams Blue Line, 284 U.S. 640, 52 S.Ct. 21, 76 L.Ed. 544. Petitioner says that the torts complained of by respondents being nonmaritime, the common-law rule is applicable, and respondents may not recover at all. But that was the contention, which was overruled, in both the Bridge Company Case, supra, and the Pennsylvania Ry. Co. Case, supra. I think the rule dividing the damages is not only supported by the weight of authority, but that it is equitable and right.

An order will enter, denying petitioner limitation of liability, adjudging both petitioner and respondents negligent, that the damages should be equally divided between them, and directing the Commissioner already appointed to ascertain the amount of damages.

### Supplemental Opinion.

Since the filing of the original opinion herein (June 4, 1936), respondents, citing Engel v. Davenport, 271 U.S. 33, 46 S.Ct. 410, 70 L.Ed. 813, Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 247, 75 L.Ed. 520, Quinlan v. Pew (C.C.A.) 56 F. 111, The Republic (C.C.A.) 61 F. 109, Parsons v. Empire Transp. Co. (C.C.A.) 111 F. 202, Weisshaar v. Kimball S. S. Co. (C.C.A.) 128 F. 397, 65 L.R.A. 84, The Erie Lighter 108 (D.C.) 250 F. 490, The 84-H (C.C.A.) 296 F. 427, and The Aloha (C.C.A.) 35 F.(2d) 447, have pressed the claim that upon reaching the conclusion that petitioner is not entitled to limitation of liability, the court's jurisdiction ends, and that the injunction suspending the prosecution of respondents' suits in the state court should be dissolved, and this case dismissed. That this is not the correct view is clearly set forth in Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 218, 47 S.Ct. 357, 71 L.Ed. 612, cited in the main opinion and in Langnes v. Green, supra, upon which respondents stand.

Langnes v. Green was a case where there was only one claim against the ship Aloha and its owner, Langnes. The claimant, Green, had filed suit in the courts of the state of Washington to recover thereon. Langnes sued in a court of admiralty, praying limitation of liability, which was denied him, and the question arose there, as here, of what should be then done. The Supreme Court held that the question was not one of jurisdiction of the court of admiralty, but one of judicial discretion, and uses this language (italics mine): "Upon the present record, the necessary result of this holding is that the state court, in the action there pending and in the due course of the exercise of its common law powers, was competent to entertain a claim of the ship owner for a limitation of liability and afford him appropriate relief under the statute dealing with that subject. Compare Loughin v. McCaulley, 186 Pa. 517, 40 A. 1020, 48 L.R.A. 33, 65 Am.St. Rep. 872. Notwithstanding this, however, the ship owner was free to invoke the jurisdiction of the federal District Court (White v. Island Transportation Co., supra [233 U.S. 346, 34 S.Ct. 589, 58 L.Ed. 993]); and, that having been done, the question which arose was *not one of jurisdiction,* but as will later more fully appear, was whether *as a matter of discretion* that jurisdiction should be exercised to dispose of the cause."

It was further held that since there was only one claim against the ship and its owner, the proper exercise of its discretion required the admiralty court to yield its jurisdiction to the state court. Here, there are ten claims against the ship and its owner.

In Langnes v. Green, the suit of the sole claimant was pending at the time of the filing of the petition of limitation of liability. Here, some of the claims had been sued upon in the state court at the time of the filing of the petition for limitation of liability, and some, by permission of this court, have been sued upon since. Permission was granted in order to meet such respondents' claim that, if not so permitted, limitation would run against them. Here, the parties are all before the court, the main controversy between petitioner and respondents, i. e., the question of the liability of the ship and petitioner, its owner, to respondents, has already and necessarily been determined, and there only remains to be determined the amount of damages, if any, suffered by each respondent. I think it would be an abuse of discretion to dissolve the injunction, dismiss this proceeding, and send all parties to a common-law court for relief.

Let a decree be prepared and presented accordingly.